STATE OF CONNECTICUT ET AL. *v.* COMMISSION ON
HUMAN RIGHTS AND OPPORTUNITIES ET AL.
(13600)

PETERS, C. J., SHEA, CALLAHAN, GLASS and COVELLO, Js.

Argued February 28—decision released June 13, 1989

*Judith M. Hecker,* assistant attorney general, with
whom, on the brief, were *Clarine Nardi Riddle,* act-

ing attorney general, *Joseph I. Lieberman,* former attorney general, and *Charles A. Overend,* assistant attorney general, for the appellants (plaintiffs).

*Philip A. Murphy, Jr.,* commission counsel, with whom was *Charles A. Krich,* staff attorney, for the appellee (named defendant).

GLASS, J. The plaintiffs, the state of Connecticut and the state teachers retirement board (board), appealed to the Appellate Court from a judgment of the Superior Court upholding an order of the defendant commission on human rights and opportunities (CHRO) awarding the defendant Paul B. Kirkland an increase in his future pension benefits. We transferred the case to ourselves pursuant to Practice Book § 4023. We find error in part and remand the case to the trial court to modify the judgment in accordance with this opinion.

The facts are not disputed. Kirkland retired from his teaching position in the West Hartford school system on February 1, 1975. Chapter 167 of the General Statutes required public school teachers to participate in a retirement benefits program, the state teachers' retirement system (system). See General Statutes (Rev. to 1975) § 10-160 et seq.[1] The board administers retirement benefits under the system. General Statutes (Rev. to 1975) § 10-163 (currently § 10-183*l*). The system is a "defined" retirement benefit plan, under which a certain benefit is determined in part by the retiree's average annual salary. At the time of Kirkland's retirement, the board funded the system by a "terminal" funding method, by which both the state and the system member contributed a sum of money to pay the defined retirement benefits. The state's contributions comprised approximately 75 percent of the funding. After Kirkland had retired, the legislature authorized auto-

---

[1] The teachers' retirement system currently is codified in General Statutes § 10-183b et seq.

matic annual cost of living increases for all retired teachers. See General Statutes § 10-183g (j). In addition, in 1982, the legislature provided "catch-up" adjustments which increased retirement benefits in proportion to the length of retirement. The "catch-up" adjustments have been funded by amortizing the cost over a thirty year period.

Kirkland received his first retirement benefit check in February, 1975. As an early retiree, Kirkland's benefits were actuarially reduced. General Statutes (Rev. to 1975) § 10-166. The board calculated appropriate reductions for early retirees by use of sex-based actuarial tables. Because of the board's use of these tables, female early retirees received monthly retirement benefits based on a larger percentage of their average salary than similarly situated males. Thus, Kirkland received, and continues to receive, a lesser amount in his monthly pension check than similarly situated females. On July 1, 1976, however, the board discontinued use of the gender-based tables and adopted a "unisex" table for computing the benefits of early retirees retiring after that date. Retirement benefits for early retiring males computed by the unisex table are equivalent to benefits for similarly situated females. Pension benefits for teachers who retire at regular retirement age have never varied according to sex.

On June 29, 1977, Kirkland filed a complaint with the CHRO, alleging that the board had discriminated against him on the basis of sex. General Statutes (Rev. to 1975) § 31-126 (a).[2] In October, 1979, Kirkland asked

[2] General Statutes (Rev. to 1975) § 31-126 (a) provides: "It shall be an unfair employment practice (a) For an employer, by himself or his agent, except in the case of a bona fide occupational qualification or need, because of the race, color, religious creed, age, sex, national origin, ancestry or physical disability, including, but not limited to, blindness of any individual, to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against him in compensation or in terms, con-

the board for a recalculation of his benefits based on the unisex table. The board denied his request in November, 1979, in part because he had filed a complaint with the CHRO. In February, 1980, Kirkland filed an amended complaint with the CHRO, adding the state of Connecticut as a respondent. In the amended complaint, Kirkland sought relief for himself and all similarly situated male retirees. The remedy sought was the difference between what he and the other male retirees had received in benefits since their retirements and what they would have received had their benefits been determined by the unisex actuarial table adopted by the board in 1976. The amended complaint also sought a future adjustment of benefits to equal that which would have been received had the benefits been computed by the unisex table.

Ultimately, in January, 1986, a CHRO hearing officer found that the board's use of gender-based tables to calculate retirement benefits discriminated against Kirkland and similarly situated men on the basis of sex. The hearing officer ordered the board to compensate the "class" for the difference between the benefits received since their retirements and the benefits

ditions or privileges of employment." See General Statutes § 46a-60 (a) (1) (codifying former General Statutes [Rev. to 1975] § 31-126 [a] as amended).

In 1980, the legislature substituted the phrase "discriminatory practice" for "unfair employment practice." Public Acts 1980, No. 80-422, § 9. In 1981, the pertinent provisions of the Fair Employment Practices Act, General Statutes (Rev. to 1975) c. 563, § 31-122 et seq., were transferred to General Statutes c. 814c, entitled Human Rights and Opportunities. See General Statutes § 46a-51 et seq.

In the present case, the CHRO hearing officer, the trial court and the parties on appeal have intermingled references to the present statutory sections with references to those sections as they existed on February 1, 1975, the date Kirkland retired. The parties on appeal have not raised any arguments concerning retroactive application of any amendments to the statutes pertinent to this case. Further, the record does not indicate that the parties raised such an issue below. Consequently, for the purpose of this appeal, our analysis is confined to the statutory scheme extant on February 1, 1975.

received by early retiring females who had retired before July 1, 1976. She also ordered the board to equalize the class's future benefits with the benefits of similarly situated females.

The plaintiffs appealed the CHRO's decision to the Superior Court. General Statutes (Rev. to 1987) § 46a-95 (j); General Statutes § 4-183. They argued that Kirkland's complaint was untimely under General Statutes (Rev. to 1975) § 31-127[3] because he had failed to file it with the CHRO within 180 days of the alleged act of discrimination. They also claimed that the CHRO hearing officer exceeded her authority in awarding Kirkland and similarly situated male retirees both retroactive and future compensation. The trial court agreed with the CHRO hearing officer that because each pension check Kirkland received constituted a "new act of discrimination" under General Statutes (Rev. to 1975) § 31-126 (a), Kirkland's complaint was not untimely. The trial court sustained the plaintiffs' appeal in part, however, ruling that the hearing officer had no authority to fashion relief for anyone but Kirkland. The trial court also ruled that the CHRO's retroactive adjustment was improper. See *Arizona Governing Committee* v. *Norris,* 463 U.S. 1073, 1106, 103 S. Ct. 3492, 77 L. Ed. 2d 1236 (1983); *Los Angeles Department of Water & Power* v. *Manhart,* 435 U.S. 702, 98 S. Ct. 1370, 55 L. Ed. 2d 657 (1978). The trial court, however, did not address the plaintiffs' appeal of the order equalizing Kirkland's future benefits. Thereafter, the plaintiffs moved to open the judgment and for reconsideration in light of the United States Supreme Court's recent decision in *Florida* v. *Long,*

[3] General Statutes (Rev. to 1975) § 31-127 provides in relevant part: "Any complaint filed pursuant to this section must be so filed within one hundred and eighty days after the alleged act of discrimination." See General Statutes § 46a-82 (e) (codifying time provisions of former General Statutes [Rev. to 1975] § 31-127 as amended).

487 U.S. 223, 108 S. Ct. 2354, 101 L. Ed. 2d 206 (1988). In a subsequent memorandum of decision, the trial court opened the judgment, rejected the plaintiffs' reliance on *Florida* v. *Long,* supra, and sustained the CHRO's order requiring future equalization of Kirkland's benefits.[4]

On appeal from the trial court's judgment, the plaintiffs do not dispute the finding that the board's use of gender-based actuarial tables to compute retirement benefits violated General Statutes (Rev. to 1975) § 31-126 (a). They claim, however, that the trial court erred in concluding that (1) Kirkland's complaint was not untimely, and (2) the CHRO hearing officer did not exceed her authority or abuse her discretion in awarding Kirkland future equalization of benefits. The trial court's invalidation of the hearing officer's class-wide relief and the retroactive relief afforded Kirkland are not at issue in this appeal. We find error in the trial court's affirmation of the amount of the future benefit increase to which Kirkland is entitled, and remand the case with direction to modify the judgment in accordance with this opinion.

I

Because the plaintiffs generally rely on federal case law to support their claims, it is useful to recognize the scope of our past reliance on federal law concerning discriminatory employment practices. "Although the

---

[4] In its original memorandum of decision, the trial court made a finding that Kirkland was deceased. One-time Hartford storyteller Samuel L. Clemens would have appreciated this finding, however, since rumors of Kirkland's death had been greatly exaggerated. On January 9, 1989, after the plaintiffs had filed their appeal, the parties stipulated to open the judgment to correct the finding that Kirkland was deceased. The trial court did so. Although the opening of a judgment after an appeal has been filed usually moots the appeal; *State* v. *Phillips,* 166 Conn. 642, 646, 353 A.2d 706 (1974); we treat the parties' stipulation as a motion to correct the judgment. Practice Book § 4051.

language of [Title VII of the Civil Rights Act of 1964, § 703 (a) (1); 42 U.S.C. § 2000e-2 (a)][5] and that of the Connecticut statute differ slightly, it is clear that the intent of the legislature in adopting 1967 Public Acts, No. 426 (which extended the provisions of the Fair Employment Practices Act . . . to prohibit discrimination on the basis of sex) was to make the Connecticut statute coextensive with the federal." *Pik-Kwik Stores, Inc.* v. *Commission on Human Rights & Opportunities,* 170 Conn. 327, 331, 365 A.2d 1210 (1976); *Wroblewski* v. *Lexington Gardens, Inc.,* 188 Conn. 44, 53, 448 A.2d 801 (1982). Although we are not bound by federal interpretation of Title VII provisions, "[w]e have often looked to federal employment discrimination law for guidance in enforcing our own antidiscrimination statute." *Department of Health Services* v. *Commission on Human Rights & Opportunities,* 198 Conn. 479, 489, 503 A.2d 1151 (1986). Nevertheless, we have also recognized that, under certain circumstances, federal law defines "the beginning and not the end of our approach to the subject." *Evening Sentinel* v. *National Organization for Women,* 168 Conn. 26, 34–35 n.5, 357 A.2d 498 (1975).

The plaintiffs first claim that the trial court erred in affirming the CHRO hearing officer's conclusion that the complaint Kirkland filed with the CHRO on June 29, 1977, was timely. General Statutes (Rev. to 1975) § 31-127 provides in relevant part that "[a]ny

---

[5] Title 42 of the United States Code, § 2000e-2 (a) provides: "It shall be an unlawful employment practice for an employer—(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin."

complaint filed pursuant to [the fair employment practices act] must be so filed within one hundred and eighty days after the alleged act of discrimination." According to the plaintiffs, the "alleged act of discrimination" occurred no later than March, 1975, when Kirkland received written notice that his pension benefits had been formally approved. They assert that each monthly pension check represented the "present effects" of a past violation of General Statutes (Rev. to 1975) § 31-126 (a), rather than a new violation. *United Air Lines, Inc.* v. *Evans,* 431 U.S. 553, 97 S. Ct. 1885, 52 L. Ed. 2d 571 (1977). They therefore assert that Kirkland's complaint, filed more than two years after he had received notice of his benefits, was untimely. We disagree.

The plaintiffs' first claim of error is largely controlled by our decision in *Veeder-Root Co.* v. *Commission on Human Rights & Opportunities,* 165 Conn. 318, 334 A.2d 443 (1973). In that case, we addressed the limitation period of General Statutes (1969 Sup.) § 31-127, which at that time was ninety days. Id., 330; see Public Acts 1974, No. 74-54 (changing period to 180 days). The complainant had filed a complaint with the CHRO on February 26, 1969, alleging that the employer had discriminated against her by paying her lower wages than it was paying men who were performing the same job. The complaint also indicated that the complainant had first confronted her employer about inequality in pay " '[a]fter July 7, 1965 when the Civil Rights Law of 1964 went into effect.' " Id., 321–22 n.2. After finding that the employer had discriminated against the complainant because of her sex, the CHRO hearing officer awarded the complainant back pay dating from October 1, 1967, the effective date of the inclusion of the prohibition against sex discrimination in the former § 31-126 (a). The trial court sustained the plaintiff's appeal in part, however, ruling that the complainant

was entitled only to back pay dating from January 22, 1969, the date she had most recently complained to her employer, to the date of payment. Id., 319–24.

Upon the CHRO's appeal, we held that the complainant was entitled to back pay dating from ninety days prior to the filing of her complaint on February 26, 1969. "There can be no doubt that the legislature intended the ninety-day limitation to serve as a bar to recovery of back pay beyond ninety days prior to the complaint." Id., 332. "By limiting the time of redress to *the act of discrimination which occurred within ninety days of the complaint,* the incentive for bringing . . . spurious actions is substantially reduced, and we think this was the intent of the legislature in establishing the ninety-day limit." (Emphasis added.) Id., 331. *Veeder-Root Co.* therefore established that the limitation period of General Statutes (Rev. to 1975) § 31-127 acted as a limitation on the *remedy* rather than a limitation on the time one can bring a cause of action. Thus, under General Statutes (Rev. to 1975) § 31-127, the *maximum* period for which one can recover for *past* acts of discrimination is 180 days preceding the filing of the complaint. Naturally, where the only past discriminatory act within the limitation period occurred less than 180 days before the complaint, the period of recovery is shortened to the time following the date that act occurred.

Our holding in *Veeder-Root Co.* clearly contemplated a "continuing violation" theory in the context of discriminatory employment practices. The employer in that case committed acts of sex discrimination preceding the effective date of the inclusion of the prohibition against sex discrimination in our antidiscrimination statute in October, 1967. The complainant, however, filed her complaint some sixteen months after that date. Nevertheless, we concluded that, rather than acting as a complete bar to the complaint, the limitation period

served as a "bar to recovery of back pay" before the ninety day period prior to the complaint. Id., 332. Indeed, we implicitly acknowledged the continuing violation principle by stating that the statutory period limited the time of redress to "the act of discrimination which occurred within ninety days of the complaint . . . ." Id., 331.

The tacit recognition of the continuing violation principle in *Veeder-Root Co.* became express in *Board of Education* v. *Commission on Human Rights & Opportunities,* 177 Conn. 75, 411 A.2d 40 (1979). In that case, the trial court upheld the CHRO's order granting relief to a female complainant who had alleged continuing acts of discrimination based on the plaintiff board's refusal to pay female custodians the same rate of pay as male custodians. Id., 76. The board claimed on appeal that the complaint lacked specificity by, inter alia, failing to disclose the precise date of the alleged act of discrimination. Id., 77. We held that "[t]he complaint adequately informed the plaintiff of an allegation of *continued discrimination* against all of its female custodians . . . . [T]here was no one single violation whose specific date should have been disclosed." (Emphasis added.) Id., 77–78. Thus, in *Board of Education,* we expressly recognized that discrete incidents occurring during a continuum of discriminatory employment practices may constitute fresh violations of General Statutes (Rev. to 1975) § 31-126 (a). Cf. *Scovill Mfg. Co.* v. *Commission on Civil Rights,* 153 Conn. 170, 175, 215 A.2d 130 (1965) (where job applicant denied employment on specific date, limitations period on complaint began to run on that date).

We reject the plaintiffs' argument that the payment of retirement benefits pursuant to a discriminatory pension plan simply reflects the "present effect of a past act of discrimination." Many of the cases the plaintiffs cite as authority concerned past acts of discrimination

wholly unrelated to the benefit schemes at issue. Indeed, the courts found that the benefit plans themselves were "sex neutral" or "race neutral." The language of these decisions strongly suggests, in fact, that the courts would have found a continuing violation in each benefit payment had the benefit plans themselves not been "neutral." See, e.g., *United Air Lines, Inc.* v. *Evans,* supra, 558 (under Title VII, past act of discrimination was forcing female to retire as stewardess upon her marriage; failure of employer to recognize her past employment upon her rehire for purpose of computing seniority credits not a continuing violation where seniority scheme itself neutral); *Alston* v. *Allegheny Ludlum Steel Corporation,* 449 F. Sup. 553, 557 (W.D. Pa. 1978) (under Title VII, where complainant denied promotion because of race, lesser pension benefits available to complainant is not continuing violation since pension system itself is "neutral in operation"); *Freude* v. *Bell Telephone Co. of Pennsylvania,* 438 F. Sup. 1059, 1061 (E.D. Pa. 1977) (under Title VII, no continuing violation where pension system itself is "fair and sex neutral"); *Devericks* v. *John Morrell & Co.,* 297 N.W.2d 325, 327–28 (S.D. 1980) (under state statute, where complainant forced to retire because of pregnancy, no continuing violation where pension system is neutral).

The plaintiffs' reliance on *Florida* v. *Long,* supra, is unsound. They argue that because this is a "pension" case and not a "wages" case, like *Board of Education* and *Veeder-Root Co.,* the continuing violation theory does not apply in determining whether Kirkland's complaint was timely. While the court in *Long* found that it is "incorrect" to consider discriminatory pension benefits as a continuing violation, its analysis was confined to the issue whether, under Title VII, an award of future increases in pension benefits was an appropriate remedy. Id., 2363. The court reasoned that a

future adjustment of benefits was not a permissible Title VII remedy because such a remedy would jeopardize the solvency of state pension funds by rendering "employers liable for all past conduct." Id., 2364. *Long's* logic is manifestly irrelevant to the issue of the effect of the limitation period in this case. If, under General Statutes (Rev. to 1975) § 31-127, Kirkland would not have been entitled to any relief unless he had filed a complaint with the CHRO within 180 days from the date of notice of his pension benefits, he would have been entitled to relief, including a future equalization of benefits, had he filed his complaint within those 180 days. The state retired teachers' pension fund therefore would have remained vulnerable in theory to the fiscal problems envisioned in *Long.* As we have already indicated, however, General Statutes (Rev. to 1975) § 31-127 limits a successful complainant's relief to a period not exceeding 180 days prior to the filing of the complaint. *Veeder-Root Co.* v. *Commission on Human Rights & Opportunities,* supra.

While the rationale of *Veeder-Root Co.* and *Board of Education* disposes of the plaintiffs' first claim, we note here that the principle of the "equitable tolling" of limitations periods based on an employer's continuing acts of discrimination is well established in the federal courts. See, e.g., *Wingfield* v. *United Technologies Corporation,* 678 F. Sup. 973, 979 (D. Conn. 1988) (tolling of period in federal age discrimination action). The federal courts have expressly recognized the applicability of equitable tolling in Title VII sex discrimination employment cases. *DiMaggio* v. *United States Postal Service,* 643 F. Sup. 1, 7 (D. Conn. 1984). The doctrine has also been applied to the limitation period applicable to pension benefit claims under the Employee Retirement Income Security Act (ERISA). 29 U.S.C. § 1113 (1982); *Meagher* v. *IAM Pension Plan,* 856 F.2d 1418, 1423 (9th Cir. 1988), cert. denied,    U.S.    ,

S. Ct.    , 104 L. Ed. 2d 414 (1989) (where amendment eliminating position-tied pension increases was wrongful, each check issued to pensioner constituted "fresh breach" of trustees' duty under ERISA). Indeed, in an analysis similar to that in *Veeder-Root Co.,* the court in *Meagher* construed the ERISA limitation period as establishing the maximum time preceding the complaint for which the claimant could recover. Id.

In the present case, we are persuaded that the rationale of *Board of Education* and *Veeder-Root Co.* applies to the payment of Kirkland's discriminatory retirement benefits. We hold that each separate payment of retirement benefits to Kirkland constituted a violation of General Statutes (Rev. to 1975) § 31-126 (a). Cf. *Meagher* v. *IAM Pension Plan,* supra; *DiMaggio* v. *United States Postal Service,* supra; *Board of Education* v. *Commission on Human Rights & Opportunities,* supra. Under General Statutes (Rev. to 1975) § 31-127, therefore, the time period for which Kirkland may have recovered began with the first pension benefit payment within 180 days prior to June 29, 1977, the date he filed his complaint.[6] *Veeder-Root Co.* v. *Commission on Human Rights & Opportunities,* supra. Consequently, the trial court did not err in affirming the CHRO hearing officer's conclusion that Kirkland's complaint was timely under General Statutes (Rev. to 1975) § 31-127. We decline to follow other cases cited by the plaintiffs holding that discriminatory pension benefit payments are the "present effects" of a past violation and therefore cannot be considered a "discriminatory act" in determining whether a complaint is timely. See, e.g., *Hannahs* v. *New York State Teachers' Retirement System,* 26 Empl. Prac. Dec. (CCH) ¶ 32,037 (S.D.N.Y. 1981); *McCarty* v. *Boeing Co.,* 321 F. Sup. 260 (W.D. Wash.

---

[6] As noted above, the CHRO has not appealed from the trial court's judgment invalidating the hearing officer's order providing Kirkland with relief for the period preceding the filing of the complaint.

1970); *Clissuras* v. *New York,* 131 App. Div. 2d 717, 517 N.Y.S.2d 39, appeal dismissed, 70 N.Y.2d 795, 516 N.E.2d 1224, 522, N.Y.S.2d 111 (1987), cert. denied, U.S. , 108 S. Ct. 1003, 98 L. Ed. 2d 970 (1988).

## II

The plaintiffs next claim that the trial court erred in failing to find that the CHRO hearing officer abused her discretion. They argue that an increase in Kirkland's future retirement benefits is unfair because at the time Kirkland retired, the case law had not established the impermissibility of gender-based actuarial computations of such benefits. See *Florida* v. *Long,* supra, 2363 (holding that 1983 decision in *Norris* established that unequal payments in retirement benefits based on gender-based actuarial tables is Title VII violation). The resources in the pension system reflect the presumed legality of the board's computation method, they argue, and to impose on the system an unexpected new liability may infringe on the statutory pension rights of other system members. We are not persuaded.

## A

Review of an appeal taken from the order of an administrative agency such as the CHRO is limited to determining whether the agency's findings are supported by substantial and competent evidence and whether the agency's decision exceeds its statutory authority or constitutes an abuse of discretion. General Statutes § 4-183 (g); *Board of Education* v. *Commission on Human Rights & Opportunities,* 176 Conn. 533, 538, 409 A.2d 1013 (1979); *Pik-Kwik Stores* v. *Commission on Human Rights & Opportunities,* supra, 329.

We first reject any suggestion that the variety of relief ordered by the CHRO hearing officer is not authorized by statute. General Statutes (Rev. to 1975) § 31-127 provides in relevant part that "[i]f . . . the

tribunal finds that a respondent has engaged in any unfair employment practice, it shall . . . issue . . . an order requiring such respondent to cease and desist from such unfair employment practice and further requiring such respondent to take such affirmative action . . . as in the judgment of the tribunal will effectuate the purpose of this chapter.''[7] This language is broad enough to cover the type of relief ordered by the CHRO hearing officer in the present case. As we observed in *Civil Service Commission* v. *Commission on Human Rights & Opportunities,* 195 Conn. 226, 230–31, 487 A.2d 201 (1985), ''the victim of a discriminatory practice is to be accorded his rightful place in the employment scheme, that is, he has a right to be restored to the position he would have attained absent the unlawful discrimination. *Spagnuolo* v. *Whirlpool Corporation,* 717 F.2d 114, 121 (4th Cir. 1983). . . . Such an order [for relief] may include retroactive and prospective monetary relief. . . . 'Where prohibited discrimination is involved, the hearing officer has not merely the power but the duty to render a decree which will, so far as possible, eliminate the discriminatory effects of the past as well as bar like discrimination in the future.' *Wroblewski* v. *Lexington Gardens, Inc.,* supra, 66–67 (*Parskey, J.,* dissenting);

---

[7] The full text of the remedy section of General Statutes (Rev. to 1975) § 31-127 provides: ''If, upon all the evidence, the tribunal finds that a respondent has engaged in any unfair employment practice, it shall state its findings of fact and shall issue and file with the commission and cause to be served on such respondent an order requiring such respondent to cease and desist from such unfair employment practice and further requiring such respondent to take such affirmative action, including, but not limited to, hiring or reinstatement of employees, with or without back pay, or restoration to membership in any respondent labor organization, as in the judgment of the tribunal will effectuate the purpose of this chapter.'' See General Statutes § 46a-86 (codifying remedy provisions of former General Statutes [Rev. to 1975] § 31-127 as amended). Public Acts 1980, No. 80-422, § 30 substituted the phrase ''discriminatory practice'' for the phrase ''unfair employment practice.''

*Albemarle Paper Co.* v. *Moody,* 422 U.S. 405, 418, 95 S. Ct. 2362, 45 L. Ed. 2d 280 (1975)."

The plaintiffs rely exclusively on the United States Supreme Court's Title VII decisions in *Manhart, Norris* and *Long,* decisions not binding on this court's interpretation of Connecticut antidiscrimination statutes, in arguing that the type of relief accorded Kirkland was improper. In each of those cases, the court ruled that although the use of gender-based actuarial tables to compute retirement benefits is impermissible under Title VII, retroactive relief was unnecessary to ensure compliance with Title VII. Of critical significance to the court was the fact that the employers may well have assumed that the method employed in computing retirement benefits was legal. *Florida* v. *Long,* supra, 2362; *Arizona Governing Committee* v. *Norris,* supra, 1110 (O'Connor, J., concurring); *Los Angeles Department of Water & Power* v. *Manhart,* supra, 720–21. As the court reasoned in *Long,* "[t]he effect of 'drastic changes in the legal rules governing pension and insurance funds' on the provision of reserves for unexpected benefits . . . the potential instability in pension and retirement programs and the resulting harm to other retirees as innocent third parties; and the absence of any reason to believe that 'the threat of a backpay award' was necessary to effect pension fund compliance with our decision, [compels] our conclusion . . . that 'the rules that apply to these funds should not be applied retroactively unless the legislature has plainly commanded that result.' [*Los Angeles Department of Water & Power* v.] *Manhart,* supra, [720–23]." *Florida* v. *Long,* supra, 2362.

We find several defects in the plaintiffs' application of the United States Supreme Court's Title VII cases to the present case. First, their argument overlooks the difference between General Statutes (Rev. to 1975) § 31-127 and its federal counterpart, 42 U.S.C.

§ 2000e-5 (g).[8] As noted above, General Statutes (Rev. to 1975) § 31-127 provides that "[i]f . . . the tribunal finds . . . any unfair employment practice, it *shall* . . . issue . . . an order requiring such respondent to cease and desist from such unfair employment practice and . . . to take such affirmative action . . . as . . . will effectuate the purpose of this chapter." (Emphasis added.) While the Connecticut statute thus mandates relief, however, its federal counterpart provides that "[i]f the court finds [an intentional discriminatory practice], the court *may* . . . order such affirmative action as may be appropriate." (Emphasis added.) 42 U.S.C. § 2000e-5 (g); see *Florida* v. *Long,* supra, 2358 and 2359 n.3; *Arizona Governing Committee* v. *Norris,* supra, 1091–92; *Los Angeles Department of Water & Power* v. *Manhart,* supra, 718–19. The United States Supreme Court has interpreted Title VII as creating a presumption in favor of retroactive relief that may be rebutted "for reasons which, if applied generally, would not frustrate the central statutory purposes of eradicating discrimination throughout the

---

[8] Title 42 of the United States Code, § 2000e-5 (g) provides: "If the court finds that the respondent has intentionally engaged in or is intentionally engaging in an unlawful employment practice charged in the complaint, the court may enjoin the respondent from engaging in such unlawful employment practice, and order such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement or hiring of employees, with or without back pay (payable by the employer,employment agency, or labor organization, as the case may be, responsible for the unlawful employment practice), or any other equitable relief as the court deems appropriate. Back pay liability shall not accrue from a date more than two years prior to the filing of a charge with the Commission. Interim earnings or amounts earnable with reasonable diligence by the person or persons discriminated against shall operate to reduce the back pay otherwise allowable. No order of the court shall require the admission or reinstatement of an individual as a member of a union, or the hiring, reinstatement, or promotion of an individual as an employee, or the payment to him of any back pay, if such individual was refused admission, suspended, or expelled, or was refused employment or advancement or was suspended or discharged for any reason other than discrimination on account of race, color, religion, sex, or national origin or in violation of § 2000e-3 (a) of this title."

economy and making persons whole for injuries suffered through past discrimination." *Albemarle Paper Co.* v. *Moody,* supra, 421; *Arizona Governing Committee* v. *Norris,* supra, 1091; *Los Angeles Department of Water & Power* v. *Manhart,* supra, 719. The plaintiffs have not directed our attention to any Connecticut cases adopting this limitation, and we decline to adopt it here. We therefore agree with the CHRO that the mandatory language of General Statutes (Rev. to 1975) § 31-127 "plainly commands" the variety of relief ordered in this case.[9]

Second, we also agree with the CHRO that the District Court for the District of Connecticut's decision of September 14, 1974, in *Fitzpatrick* v. *Bitzer,* 390 F. Sup. 278 (D. Conn. 1974), rev'd in part on other grounds, 519 F.2d 559 (2d Cir. 1975), rev'd on other grounds, 427 U.S. 445, 96 S. Ct. 2666, 49 L. Ed. 2d 614 (1976), gave the plaintiffs fair warning that the board's use of gender-based tables to compute retirement benefits constituted a violation of Title VII and, by implication, the Connecticut antidiscrimination statute. In *Bitzer,* the court ruled that Connecticut's state employees' retirement system impermissibly discriminated against men on the basis of sex by providing lesser retirement benefits for men as compared to women. Id., 281–83. "The Connecticut retirement plan constitutes an unlawful employment practice, because it discriminates between men and women with regard

---

[9] The current version of the remedies provision at issue in this case retains the mandatory language respecting orders of affirmative relief. "If, upon all the evidence presented at the hearing . . . the hearing officer finds that a respondent has engaged in any discriminatory practice, the hearing officer shall state his findings of fact and shall issue and file with the commission and cause to be served on the respondent an order requiring the respondent to cease and desist from the discriminatory practice and further requiring the respondent to take such affirmative action as in the judgment of the hearing officer will effectuate the purpose of this chapter." General Statutes § 46a-86 (a).

to employment fringe benefits and is therefore . . . illegal and in violation of [Title VII]." Id. The state in that case did not appeal from the substantive finding respecting the Title VII violation.[10] While the plaintiffs seek to distinguish *Bitzer,* we are persuaded that the decision sufficiently alerted the board to the illegality of its gender-based pension computation method.

Third, the hearing officer found as a matter of fact that the imposition of a retroactive remedy *and* future equalization of benefits to the *entire class* represented by Kirkland would not unduly burden the retirement benefits system. The plaintiffs have not challenged the hearing officer's finding that the "funding [of cost of living increases and 'catch-up' allowances] is subject to adjustment by the [plaintiffs] in accordance with public policy as well as actuarial principles." In light of this finding, the plaintiffs have not substantiated their claim that imposition of an order requiring *only* the future equalization of Kirkland's benefits *alone* "inequitably" threatens the system's ability to meet existing and expected obligations to other retirees.

Fourth, there are great practical differences between the present case and *Long, Norris* and *Manhart.* The three United States Supreme Court decisions involved class actions seeking Title VII remedies. This case involves one complainant seeking a remedy under Gen-

---

[10] Despite its ruling that the retirement plan violated Title VII, the District Court held that the eleventh amendment barred the plaintiffs' request for retroactive relief and attorney's fees against the state. *Fitzpatrick* v. *Bitzer,* 390 F. Sup. 278 (D. Conn. 1974). Upon the plaintiffs' appeal, the Court of Appeals for the Second Circuit affirmed the District Court's ruling respecting retroactive relief, but held that the plaintiffs were entitled to attorney's fees. *Fitzpatrick* v. *Bitzer,* 519 F.2d 559 (2d Cir. 1975). The United States Supreme Court reversed, holding that the eleventh amendment did not bar either retroactive relief or the recovery of attorney's fees. *Fitzpatrick* v. *Bitzer,* 427 U.S. 445, 96 S. Ct. 2666, 49 L. Ed. 2d 614 (1976); see *Fitzpatrick* v. *Bitzer,* 455 F. Sup. 1338 (D. Conn. 1978) (determination of attorney's fees on remand).

eral Statutes (Rev. to 1975) § 31-127. The factors underlying the United States Supreme Court's apparent concern for state pension programs are not present in this case. Our decision does not raise the spectre of insolvent pension plans throughout the fifty states, a factor clearly given significant consideration by the United States Supreme Court in the Title VII cases.

Fifth, we are persuaded that a greater "inequity" may be done in applying the "retroactivity" analysis of the *Manhart, Norris* and *Long* Title VII decisions to remedies available under General Statutes (Rev. to 1975) § 31-127, insofar as those decisions treat future equalization of pension benefits as a nonrecoverable "retroactive" remedy. The elimination of such a remedy may very well deter individuals currently suffering ongoing forms of impermissible employment discrimination in similar contexts from bringing actions to enforce their rights. Cf. *Association Against Discrimination in Employment, Inc.* v. *Bridgeport,* 647 F.2d 256, 279 (2d Cir. 1981), cert. denied, 455 U.S. 988, 102 S. Ct. 1611, 71 L. Ed. 2d 847 (1982) (in fashioning Title VII relief under 42 U.S.C. § 2000e-5 [g], consideration should be given to complainants and those similarly situated). Whatever progress *Long* may betoken for Title VII law, elimination of the type of relief ordered in the present case would not enhance the remedial purposes of our discriminatory employment practices legislation.

Finally, the conclusion we reach today is not without federal precedent. In *Rosen* v. *Public Service Electric & Gas Co.,* 477 F.2d 90 (3d Cir. 1973), the defendant's pension plans discriminated on the basis of sex by providing greater benefits to women taking early retirement than similarly situated men. The Court of Appeals reversed the District Court's failure to award "compensatory damages" to males who retired early. Id., 93, 95. The court held that "[m]en who have

retired . . . with annuities reduced below those which they would have received had they been women must be compensated for the losses they sustained and *are sustaining* due to the discriminatory reduction in the amount of pensions . . . . " (Emphasis added.) Id., 96. "The relief is intended to restore those wronged to their rightful economic status absent the effects of the unlawful discrimination. . . . We are under a duty to render relief which will eliminate the 'discriminatory effects of the past as well as bar like discrimination in the future.' *Louisiana* v. *United States,* 380 U.S. 145, 154, 85 S. Ct. 817, 822, 13 L. Ed. 2d 709 (1965) . . . . " (Citations omitted.) Id. While its exegesis of Title VII remedies may be in doubt after *Long,* we find *Rosen* much more congenial to the remedial objectives of the Connecticut legislation than the *Manhart* and *Long* cases.

## B

We do agree with the plaintiffs' claim, however, that the CHRO hearing officer exceeded her statutory authority in shaping the specific contours of Kirkland's remedy. As noted above, the hearing officer determined that Kirkland's future benefits should be equalized with the benefits received by similarly situated females, rather than recomputed by the unisex table. The CHRO in this case did not file its own complaint against the board but acted solely on Kirkland's complaint. General Statutes (Rev. to 1975) § 31-127; General Statutes § 46a-82 (b) and (c). Further, the record discloses that the remedy Kirkland sought was the recalculation of his benefits based on the unisex table implemented by the board on July 1, 1976. "If the [CHRO] prosecutes an alleged unfair employment practice upon the complaint of an individual without initiating its own, separate complaint, and absent a proper amendment authorizing broader relief, the tribunal may fashion a remedy only within the confines of the complaint and

afford relief only to the individual complainant." *Groton v. Commission on Human Rights & Opportunities,* 169 Conn. 89, 100, 362 A.2d 1359 (1975).

We conclude that the trial court did not err in finding that Kirkland's complaint was not untimely under General Statutes (Rev. to 1975) § 31-127. We hold, however, that the trial court erred in affirming the hearing officer's order requiring the board to make Kirkland's future retirement benefits equal to those of similarly situated females. Kirkland is entitled to the difference between the amount received pursuant to the board's calculation of his benefits and the amount he would have received had his benefits been calculated according to the unisex actuarial table adopted by the board on July 1, 1976. The period for which the differential must be allowed is from June 29, 1977, the date he filed his complaint, and thereafter.

There is error only with respect to the amount of the future retirement benefit increase to which Kirkland is entitled, and the case is remanded with direction to correct the judgment in that respect in accordance with this opinion.

In this opinion the other justices concurred.

