[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
In the instant case the plaintiff alleges the existence of discriminating employment practices and a denial of the equal employment guarantee due to sexual harassment. The Commission on Human Rights and Opportunities (C.H.R.O.) has issued the necessary release allowing the civil action to be brought. Gen. stat. § 46a-101. For relief, the plaintiff seeks damages, costs and interest for sexual harassment occurring when she was a correction officer at the New Haven Correctional Center (hereinafter NHCC).
The defendant has denied the essentials of the complaint and also has pleaded three special defenses, namely: a failure to mitigate damages; a claim that certain expenses and damages are subject to set-off because of the amount received by the plaintiff in her workers' compensation case; and a claim that the plaintiff's case is barred by an accord and satisfaction because the workers' compensation case was settled by a stipulation.
 I.
From the evidence produced at the trial, the court finds that the facts set forth below were established.
After graduating from high school in 1961, the plaintiff was employed for many years as a waitress. One reason that she preferred this type of work was that she was able to be physically active. In 1974, the plaintiff had surgery for pulmonary embolisms and she was advised not to do sedentary work. For this condition, she takes the blood thinner known as coumadin. Also between 1974 and 1989, the plaintiff's gallbladder and appendix were removed, a hernia was repaired, and in 1986 or 1987 she had a hysterectomy. Her ovaries were removed in 1996.
In 1989, the plaintiff was working at the Atlantic Restaurant CT Page 9219 on Orange Street, not far from the courthouse in New Haven. Correction officers patronized the restaurant, talked about their jobs, and the plaintiff became interested. She applied to the Department of Correction, was interviewed, took and passed an examination, and on July 1, 1990 she reported to the academy for six weeks of classes and training. The program included the following courses: Prison Society, Prison Environment, Inmate Supervision, Communication Skills, Conflict Management, Use of Force, Legal Issues, Radio Procedures, Security Skills, Report Writing, Cultural Sensitivity, Disciplinary Procedures, Visiting Regulations, Mail Regulation, Hostage Negotiation, Contraband Control, Transportation, Restraints, Mentally Ill/Retarded Inmates, Suicide Prevention, Emergency Procedures, Communicable Diseases, Aids Presentation, Preservation/Evidence, Chemical Agents, Hostage Survival, Substance Abuse, First Aid, Basic Life Support, Baton, Cell Extraction, Fire Extinguisher, Employee Safety, Self-contained Breathing Apparatus, Problem Solving, Cross Gender Supervision, Warden's Panel, Personnel Policies, Introduction to Correction, Commissioner Address, Stress Management, Cultural Issues, Career Development, Classification Procedures and Tell It Like It Is. The plaintiff achieved a weekly test average of 90.38 and a quiz average of 87.43.
The Cultural Issues course was taught by Ana Scott from the Affirmative Action Unit of the Department of Correction and lasted about 2-1/2 hours. In class, Ms. Scott talked about the Civil Rights Act of 1964 and the comparable Connecticut law. Projected transparencies were used as teaching aids. One transparency consists of a circular graph and states that the "Civil Rights Act of 1964 prohibits discrimination based on Race, Religion, Color, Sex Harassment, National Origin." A second transparency is entitled "Sexual Harassment" and contains a definition of "unwelcome sexual advances, requests for sexual favors, or other verbal or physical conduct of a sexual nature. A third transparency bears the title in bold capital letters of "Conditions Indicating Presence of Sexual Harassment" followed by three examples: (1) Submission to such conduct is made explicitly or implicitly a term or condition of an individual's employment; (2) Submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such an individual; (3) Such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment. A fourth transparency is headed "Examples of Sexual Harassment" and lists vertically the following: "Unwelcome sexual CT Page 9220 advances, Suggestive or lewd remarks, Unwanted hugs, touches or kisses, Requests for sexual favors, Retaliation for complaining about sexual harassment, Derogatory or pornographic posters, cartoons or drawings." Further transparencies deal with affirmative action and other anti-discrimination laws. As part of the course a Bill Cosby film dealing with all areas of discrimination was shown.
As part of the academy program, the plaintiff learned about verbal abuse. It was described as the inmates' weapon. She and the other cadets were told that not every instance of verbal abuse should merit the issuance of a ticket for disciplinary action. Otherwise, they were informed, the inmates would realize how easy it would be for them to cause a particular correction officer to lose his or her temper.
Another part of the academy program was the so-called desensitizing session. Early on in the program, all cadets were sent to NHCC. There they learned about the duties of a correction officer from the viewpoint of personnel working inside a penal institution. The plaintiff, who had not been in a jail before, was amazed as to the amount of movement within the institution that inmates actually had. During the three day desensitizing session, she observed inmates using vulgar language to members of the correctional staff.
In line with the desensitizing session and what the plaintiff was told about reacting to verbal abuse from inmates was the class in Stress Management. In this class, cadets were informed of the Employee Assistance Program (EAP) where an employee could seek help from a stress-related or other type of problem in confidence.
At the academy, the plaintiff's class consisted of six women and twenty-five to thirty men. One of the males was Tracy Felton. One day after classes were finished and the plaintiff was leaving, someone asked her why she was in such a hurry and did she have a date. Tracy Felton responded that the plaintiff did not date men and liked women. The plaintiff told Felton that if she heard him make such a statement again, anywhere, she would slap his face. Felton's comment was the only one of this nature that was made to the plaintiff when she was attending the academy. The plaintiff did not report Felton. Nor did she disclose what he had said to anyone in authority until later when Affirmative Action was investigating her complaints., CT Page 9221
In August, 1990, after graduation from the academy, the plaintiff was assigned to NHCC. In September or October, she began to hear comments that were made to her or about her by the inmates. She was asked if she were a man and if she had a sex change operation. When the plaintiff was doing her tours of the cell blocks, she heard inmates describe her as "the bitch with the balls" and "the C.O. with the dick." Mindful of what she had been told at the academy, the plaintiff did not issue any disciplinary tickets.
The plaintiff did report an incident that occurred in August, 1991. The plaintiff was standing inside the gymnasium but close to the door. She was watching over a bible study class in the 4:00 p. m. to midnight shift. Outside the door, in the inmate visiting area, she heard some inmates say "the half-man homo isn't working the gym tonight; we are going to f__k her up to see what she has between her legs." The plaintiff had no idea who made these statements. She estimated that there were approximately 500 inmates at the time although Warden Gillis stated that the population was half that amount. When she reported the incident to Captain Riddick, the duty officer that night. she told him only that the inmates referred to her as the "half man" and that there were rumors going around making it uncomfortable to work. She was too embarrassed to repeat the rest of what she heard. The plaintiff's oral complaint to Captain Riddick was the first time she had reported verbal abuse to a superior.
Both maximum and minimum security risks were housed at NHCC. An inmate named Trimmer was transferred to NHCC from the prison at Somers. When the plaintiff approached Trimmer to hand him commissary slips, he swore at her and threatened to rip her throat from her body. This threat and others from Trimmer, the plaintiff ignored and never reported. On August 12th or 13th, 1991, during one of the plaintiff's tours through the cell blocks, Trimmer asked her if what the officers say about her is true. When the plaintiff asked what was said, Trimmer responded "[h]e said you are not a woman, that you are in fact a man, and that you had a sex change operation." The plaintiff told Trimmer that the statement was not true. Trimmer then said that it wasn't right what they were saying about the plaintiff. He declined to give her any names but told her to think about who relieved her when she worked in Charlie Unit.
After speaking with Trimmer, the plaintiff discussed the CT Page 9222 matter with her direct supervisor, now-deceased Lieutenant Carolyn Moore, who had not heard the rumors but advised the plaintiff to fill out a report. The incident report that the plaintiff submitted was dated August 13, 1991 at 3:45 a.m. and recited that from the plaintiff's conversation with Trimmer, she learned once again that fellow officers have told inmates that she is a transvestite and does not like men. The report acknowledges that several inmates have told her the same story in the past and that Trimmer did not divulge the name of his sources.
As a result of the plaintiff's report, she was seen once or twice by Major Thomas Langner later in August, 1991. The plaintiff testified that she informed Major Langner that the rumors made her uncomfortable around inmates and officers. Langner's recollection was that only inmates and not staff were spreading the rumors. He spoke about the Employee Assistance Program (EAP). Langner had also received a memo from Captain Riddick that the plaintiff had reported the incident jokingly . . Langner did not speak to the inmates in Trimmer's block as he did not want to put ideas in their heads. He sent a memo to Deputy Warden Arasimowicz concerning the plaintiff's complaint and they discussed it.
Still later in August, 1991, the plaintiff was seen by Deputy Warden Donald Arasimowicz. The plaintiff described her demeanor at this meeting, and the earlier one with Major Langner, as very upset. Arasimowicz reported the meeting in writing accompanied by several attachments to Warden Gillis on August 29, 1991. According to Arasimowicz' memo, the plaintiff reported that things in F-Block where she was working had gotten better but she feared a renewal of the rumors when she changed posts. Arasimowicz also wrote that the plaintiff declined EAP help because of the support given to her by her supervisors. Further parts of Arasimowicz' memo were that all staff have been reminded "regarding professional conduct and possible consequences of any 'harassing' statements or actions made to or about fellow staff." Arasimowicz stated in his memo that he advised the plaintiff to continue discussing any possible harassing behavior by officers or inmates with her supervisors. He also told her he would be speaking to her again in order to monitor the situation. In September of 1991, however, Arasimowicz was transferred to Gates Correctional Center.
Periodically the plaintiff asked her supervisors if they heard rumors about her from inmates or corrections officers. She received negative answers. On February 28, 1992, the plaintiff CT Page 9223 received a "good" rating on the formal appraisal of her job performance. Such an appraisal is done annually.
At the end of March, 1992, the plaintiff had a conversation with Vernetha Gibson, a fellow correction officer. As related by the plaintiff, Gibson said that she should be careful in the block as the inmates had become curious because Correction Officers Barnes and Felton had said that if the plaintiff's pants were removed, her "dick" would be bigger than theirs. The plaintiff went to see Major Mario Pizighelli on April 1, 1992, the next day, and told him about the rumors concerning her sexuality. Before April 1, 1992, Major Pizighelli had been unaware of the rumors.
On April 19, 1992, Major Pizighelli sent a memorandum about his April 1st meeting with the plaintiff to Warden Gillis. In the memorandum, Pizighelli noted that the plaintiff feels that comments about her sexuality result from staff talking about her to other staff and to inmates. In the memorandum, Pizighelli reported that he asked the plaintiff for names of staff who might be involved and that she said that she had heard it from another "C.O." and would prefer not to divulge names at this time.
Department of Correction Administrative Directive 2.2 dealing with Sexual Harassment had become effective on November 18, 1991. On April 2, 1992, the day after he spoke with the plaintiff, Major Pizighelli issued the following notice to all employees which was read at roll call for seven days.
 Employees shall not engage in sexually harassing conduct. Conduct which shall constitute sexual harassment includes but is not limited to:
 a. Any sexual flirtation, touching, advance or proposition;
b. Verbal abuse of sexual nature;
 c. Any graphic or suggestive comment about an individual's dress or body;
 d. Sexually degrading words to describe an[d] individual;
 e. The display in the workplace of sexually suggestive objects or pictures, including nude photographs; CT Page 9224
 f. Making a comment and/or circulating a rumor which embarrasses, ridicules or demeans a person because of the individual's gender or sexual orientation; or
 g. Any threat or insinuation, either explicitly or implicitly, that employee's refusal to submit to sexual advances shall adversely affect the employee's employment, evaluation, wages, advancement, assignment duties, or any other condition of employment.
 Any employee found to have engaged in sexual harassment or to be found negligent in pursuing appropriate action may be subject to disciplinary action.
The plaintiff filed a written complaint, dated April 22, 1992, addressed to Warden Gillis and gave it to him in Major Pizighelli's office. In this writing the plaintiff complained of sexual harassment she had endured for 1-1/2 years which she detailed as (1) officer claims to have seen male organs on my person. (2) that I am a transvestite, awaiting further sexual operations. (3) officer stated in front of inmate and other officer that if I took my pants down, I had a "dick" longer than his. (4) officers while in the O.M. stated to other female staff to stay away from me, because I was actually half man. (5) While on post, on more than one occasion — [I] overheard inmates state they would "f__k me up" to see if I had a "dick" between my legs. (6) [I am] constantly being challenged and asked if it is true that I am not a woman, but in fact I am half man. The inmates are challenging my ability to do my job.
The plaintiff's written complaint reminded Warden Gillis that in August, 1991, she had filed a written complaint with Major Langner and Deputy Warden Arasimowicz and had never received a status report of any kind concerning it. Major Pizighelli had informed her that the paper work on the earlier complaint could not be located. In her new written complaint, the plaintiff asserted that she was being put in a "near and present" danger by inmates. Her request was that "until these rumors cease and disciplinary action [is] brought [against] these officers, "you remove me from "general inmate population." But, as with her earlier oral and written complaints, the plaintiff still declined to name specific officers who she believed were or might have been involved with the rumors and comments about her sexuality. CT Page 9225
The six items listed in the plaintiff's second written complaint were attributed by her to the following sources: item 1, C.O. Manny Ray had told the plaintiff that correction officers at a party in 1991 had said this to him; item 2 was brought to the plaintiff's attention by C.O. Tony Storey; item 3 refers to statements by Officers Barnes and Felton as related to the plaintiff by C.O. Vernetha Gibson; item 4 was told to the plaintiff by Paula Matthews, a medic at NHCC; items 5 and 6 were questions or comments from inmates.
On April 22, 1992, an incident occurred in the inmates' visitation area that caused the plaintiff to "write up" inmate Douglas Franklin as well as to lose her self control. Visiting hours were over and the plaintiff had asked Franklin's visitor to leave three times. Franklin said "You f_____g half-man bitch, f__k you." In the corridor, Franklin's visitor referred to the plaintiff as "faggot bitch." After the visitor left and Franklin was returned to his dormitory or cell, the plaintiff broke down and cried. She reported the incident to Administrative Captains Cleveland and Barile, said she could not go on, and left NHCC.
The plaintiff met with Major Pizighelli again on April 28, 1992. She reported that she had followed his advice and had met with a representative of EAP who had recommended Comprehensive Psychiatric Services. At Comprehensive Psychiatric, the plaintiff saw Ellen Dechoff, a social worker, and Dr. Jeffrey Klugman, a psychiatrist.
Also at the meeting on April 28, 1992, the plaintiff gave Major Pizighelli the names of three correction officers, Kenneth Barnes, Vernetha Gibson and Ricardo Flores, who she thought might be able to identify the officers who were responsible for the rumors and comments concerning her sexuality. Pizighelli interviewed and took statements from each of them. Barnes and Gibson gave outright denials as to the existence of anyone spreading rumors about the plaintiff or as to the existence of any rumors. Flores said that he had been approached by the plaintiff in the Officers' Mess Hall two or three months ago and she told him that certain officers had been making derogatory comments about her. Flores replied that he thought he heard some derogatory comments about the plaintiff at roll call. He did not recall who said what or what was said. The dates of the interviews were Flores on April 29th, Gibson on May 4th, and Barnes on May 6th, 1992. CT Page 9226
In the course of investigating the incident that occurred in the visiting area, on April 22, 1992, inmate Franklin was interviewed and his statement taken by Captain Barile. And Captains Barile and Cleveland sent memoranda to Major Pizighelli. Inmate Franklin admitted only that in response to the plaintiff's showing of disrespect to his girlfriend, he yelled at her that she was a man. He had heard from other inmates, not from staff, that she used to be a man. He did not remember who the inmates were. Captain Barile's memorandum dated May 5, 1992, referred to the plaintiff's complaint in 1991 and his immediate notification of it to Major Langner and Deputy Warden Arasimowicz. Since that time, his memo stated that he questioned the plaintiff as to whether she had heard further comments. She informed him, according to the memo, that she did on one or two occasions but was unable to identify the verbal inmates or staff due to groups being in the area. Captain Cleveland's memo, dated May 4, 1992, concerned a conversation with the plaintiff in the preceding March. The plaintiff asked if Cleveland had heard any rumors about her. When Cleveland said she had not, the plaintiff told her that a staff member who she thought was Barnes, had called her a half man in front of inmates and the matter had been investigated. According to Cleveland's memo, the plaintiff said that there weren't any other problems until March, 1992, when an inmate made a comment that she had reported to Captain Barile.
On May 7, 1992, Major Pizighelli met with the plaintiff at her request. He informed her that Jack O'Neill at EAP had notified him that Comprehensive Psychiatric Services had requested that she not return to work. The plaintiff was put on sick leave effective May 9, 1992. At Major Pizighelli's request, the union steward attended the meeting and arranged for the plaintiff to be given Workers' Compensation forms. On the same day, Major Pizighelli notified Warden Gillis of what transpired by written memorandum.
At one of the meetings between Major Pizighelli and the plaintiff, she mentioned Correction Officer Tracy Felton as one she suspected of making or spreading the rumors. Felton was not interviewed by Major Pizighelli as he was out of work on Workers' Compensation. From the evidence, it appears that Felton was never interviewed by anyone.
On April 30, 1992, the plaintiff made a telephone call to the Affirmative Action Unit of the Department of Correction in Hartford. Ana Scott of that office returned the call and the CT Page 9227 rumors about the plaintiff's sexuality and her claim that they had not been investigated were discussed. A formal Affirmative Action complaint was filed on May 18, 1992. Attached to the formal complaint was a copy of the plaintiff's written statement to Warden Gillis, dated April 22, 1992, that she had given to him in Major Pizighelli's office. The plaintiff had sent another copy to Ana Scott along with a letter dated May 8, 1992.
Ana Scott reported the matter to Michelle Garvey who was, at the time, the Affirmative Action Officer along with the fact that the plaintiff did not have a car and the plaintiff's request that she not be interviewed in a facility. A meeting of Ana Scott, Michelle Garvey and the plaintiff took place on May 14, 1992 in New Haven starting at Atticus Book store and continuing at a nearby restaurant called the Copper Kettle. The plaintiff asked Garvey and Scott to interview Correction Officers Vernetha Gibson, Kenneth Barnes, Tracy Felton, Paula Matthews, Manuel Ray, Ricardo Flores, Anthony Storey and C.O. Madonna as well as Lieutenant Moore, Captain Riddick and Captain Barile.
Michelle Garvey and Ana Scott did not get around to interviewing people until August 6, 1992 when interviews were conducted at NHCC. Before the interviews started, Garvey and Scott met with the plaintiff at her request. At that time she told them that Vernetha Gibson would not confirm anything to us because she had been threatened by Kenneth Barnes.
Almost every one of the persons on the plaintiff's list were interviewed. Michelle Garvey or Ana Scott took contemporaneous notes. All the correction officers denied being — a source of the rumors although most acknowledged that rumors existed such as the plaintiff is a he/she, had a sex change and "the bitch is a guy." One or more of the officers said that the rumors started in the academy and came to NHCC with the plaintiff. The officers who were interviewed ascribed the spreading of the rumors to the inmates and to other officers whose names were unknown or had been forgotten.
The supervisors, when interviewed, said that they heard rumors about the plaintiff from herself but never from a co-worker. They, including Lieutenant Moore, the plaintiff's direct supervisor, were of the opinion that the plaintiff always seemed to be upset. Another rumor concerning a supervisor but mentioned only by C.O.'s was that the plaintiff was having an affair with one of the captains. CT Page 9228
On August 13, 1992, Ana Scott prepared and sent to Warden Gillis a draft of the recommendations of the Affirmative Action Division. The Affirmative Action Findings were that the rumors and comments have occurred. Although none interviewed would identify those persons who started or spread the rumors, Affirmative Action was able to ascertain that the first rumor started with the plaintiff's class at the academy and followed her into NHCC. Affirmative Action's advice as to what should be done was "Offer, on a first available basis, to transfer Ms. Britell to another institution, within reasonable commuting distance of New Haven where she resides. We would also recommend that Ms. Britell be given a choice to transfer into one of these facilities: Cheshire CC, Cheshire MYI, Webster, Maloney or Union Avenue." Union Avenue is located in New Haven. All the other named facilities are in Cheshire.
When the investigation was finished but before the report was written. Michelle Garvey and Ana Scott offered to recommend a transfer for the plaintiff to any institution that she chose in the correction system. The plaintiff rejected the idea of a transfer for reasons that she had a new apartment, did not own a car and her mother lived in the area, although information regarding car pools to correction facilities in Cheshire was given.
Subsequent to the Affirmative Action recommendation, the plaintiff, while on medical leave, discussed a transfer with Dianne Pierpont a personnel officer with the Department of Correction. Pierpont asked the plaintiff where she wanted to go and mentioned the institutions in Cheshire and later the women's facility in Niantic. Pierpont presented the plaintiff's case as a hardship transfer and received authorization from the Director of Human Resources to offer the plaintiff a transfer to Niantic as the best solution available to separate her from the rumors. For a second time, the plaintiff rejected a transfer giving as reasons her medical problems and her lack of a car. In August, 1992, however, the month that the plaintiff went on medical leave, she applied to Deputy Warden Horn for a transfer to Camp Hartell in Windsor, a place where white collar and D.U.I. offenders are confined. She did not mention Camp Hartell in her later conversations with Diane Pierpont who was unfamiliar with her application for transfer. Except in a case of hardship, any transfer between facilities would be subject to seniority rights pursuant to the contract between the State and the correction employees' union. CT Page 9229
In the plaintiff's discussions with Michelle Garvey and Ana Scott, she mentioned that she had an attorney. The plaintiff had been in contact by telephone with a particular New Haven lawyer. At one point she mentioned that she would be getting a new attorney. Neither Michelle Garvey nor Ana Scott threatened to skew the Affirmative Action investigation in favor of the State if the plaintiff were represented by counsel.
As the Affirmative Action investigator, Ana Scott did not recommend disciplinary action for the reason that it was never established which of the correction officers started or spread the rumors. Apparently C.O. Storey said that C.O. Barnes repeated one or more of the rumors several times, but Storey was unwilling to give a statement. If he had, a disciplinary proceeding could have been brought against Barnes. Provision for discipline and punishment of employees is another item in the union contract.
As between the department of Correction and the inmates, discipline is governed by the Code of Penal Discipline. When inmate Douglas Franklin called the plaintiff a f_____g half-man bitch on April 22, 1992, sexual misconduct, a Class A offense under the code, did not encompass words of sexual harassment. Franklin was chargeable only with the Class B offense of Insulting Language or Behavior and the Class C offense of Disruptive Behavior. He was charged with the "B" and "C" offenses, pleaded guilty and was disciplined with segregation and confinement to quarters.
Among the plaintiff's witnesses at the trial were Correction Officer Manuel Ray and former Correction Officers Paula Felicello, nee Matthews, Emily Stewart and Kenneth Barnes. Manuel Ray testified that correction officers often said, in the presence of inmates, that the plaintiff was a man who had a sex change and that at a party light shone through the plaintiff's dress so that her "dick" could be viewed. Ray said he had spoken to the plaintiff about the rumors before he was interviewed by Michelle Garvey and Ana Scott. As he recalled, the roll call announcement about sexual harassment not being tolerated occurred before his affirmative action interview.
Paula Felicello testified that on one occasion in the officer's mess, she was asked by male correction officers why she had the plaintiff for a partner in a training session and did she know that the plaintiff had been a man. Emily Stewart's testimony CT Page 9230 was that she heard remarks from male correction officers several times at lunch. She recalled the roll call announcement that sexual harassment would not be tolerated but did not remember when the announcement was made.
Kenneth Barnes admitted that his statement to Major Pizighelli that he knew nothing about the rumors was a lie but claimed that the union's stewards wanted a denial. His testimony certainly differed from his statements to Michelle Garvey and Ana Scott. To them, he said that he had only heard the rumors from inmates. At trial, he said that the rumors were started by officers who were in the plaintiff's class at the academy and he had observed "management," defined as lieutenant or above, laughing about the rumors and spreading them. Barnes was dropped as a correction officer in 1993 after he was convicted of receiving stolen property. He admitted lying during the investigation of the crime.
When the plaintiff returned to work at NHCC after the incident with Douglas Franklin, she was assigned to the guardhouse away from the inmate population. Inside the jail, itself, however, she saw, on one occasion, graffiti that she felt pertained to her. At the guardhouse gate, she observed a small hermaphroditic figure scratched into the wall with the word "heman." She scratched out the figure. Later she was posted at central control, also an area away from the inmates, and her denim jacket disappeared. When she found the jacket, she received what appeared to her to be a threatening telephone call. She became frightened and refused to obey an order from a superior that she supervise the feeding of inmates in one of the dormitories.
After Warden Gillis received the report and recommendations of the Affirmative Action Division, he informed the plaintiff that she would have to return to the regular rotation cycle (every sixth week) applicable for all correction officers. She was no longer on leave and, therefore, was to be considered as a member of the regular work force. The plaintiff decided not to return to the blocks and dormitories of the inmate areas because she felt that she could not do the job. On August 24, 1992, the plaintiff applied for medical leave. The next day her application was granted. In March, 1993, a workers' compensation claim was initiated. Subsequently, this claim was resolved by a stipulation for $62,000.00. The opinion of Dr. Jeffrey Klugman, the plaintiff's psychiatrist was that the rumor that she was a transvestite or a hermaphrodite that circulated among her fellow correction CT Page 9231 officers and the inmate population was the cause of a major depression necessitating medications and psychotherapy on an ongoing basis.
The plaintiff described her condition in terms of the rumors causing her to lose her femininity and be disdainful of her body. For example, she was unconcerned and still that the inmates called her bitch and whore or that her fellow C.O.s talked about an affair between her and a captain. Her rationale is that these are feminine things whereas being called a transvestite or a hermaphrodite is not.
Dr. Mark Rubinstein, a psychiatrist who was the plaintiff's only medical witness concurred basically in Dr. Klugman's diagnosis of major depression, although he said her condition could be dysthymia, a more moderate depression. Dr. Rubinstein saw little improvement in the plaintiff's condition from 1993 when he examined her on behalf of the State in the workers' compensation proceeding. His prognosis was that her condition was lifelong necessitating treatment by psychotherapy and medications. of similar import was the report of Dr. Robert Ohlin, a psychologist associated with Dr. Klugman.
Angela Britell, the plaintiff's mother, and Theresa Webber, her friend describe the plaintiff as having been changed by her jail experience from a cheerful person to one who is withdrawn. Nevertheless, the plaintiff was married on December 16, 1995. It was a large wedding with 150 guests and six or seven bridesmaids. Theresa Webber was a bridesmaid and described the plaintiff at the wedding as the happiest I have seen her since she left the jail. The plaintiff's mother believes that the plaintiff is "coming back" although she doubts that the plaintiff will ever be the same as she was before going to work in the jail. The plaintiff returned to work as a waitress at Yorkside Pizza in September, 1992.
Robert Gillis, the warden of NHCC from August, 1991 to September, 1992, became aware of the plaintiff's first complaint on September 3, 1991 when he received and read the memorandum written by Deputy Warden Arasimowicz on August 29, 1991. As already noted, Arasimowicz' memo had several attachments here specified as the incident reports of the plaintiff and Lieutenant Moore, a statement by inmate Trimmer, the memo from Captain Riddick to Major Langner, all dated August 13, 1991, and the memo from Major Langner to the deputy warden dated August 14, 1991. Warden Gillis did CT Page 9232 not investigate the incident further because none of the writings indicated any specific person as the culprit.
Nor did Warden Gillis inquire as to the form of Deputy Warden Arasimowicz' reminder to all staff concerning professional conduct and possible consequences of harassing actions or statements made to or about staff members. In August, 1991, the Department of Correction had no specific directive on sexual harassment although cadets being trained for C.O. positions were lectured about it at the academy. Administrative Directive 2.2, setting forth departmental policy and procedure for enforcement did not, as previously mentioned, become effective until November 18, 1991. But the absence of a written policy did not mean that violators of Arasimowicz' reminder would go unpunished. In the department's Employee Handbook under the category, "You and Your Work Place", paragraph 5 states in part "It is forbidden for employees to discuss other employees with or in the presence of inmates, or to permit such discussions by inmates . . . . "
Before November 18, 1991, the effective date of the departmental policy on sexual harassment with its requirement that the Affirmative Action Unit investigate once a complaint is made, Warden Gillis had discretion as to whether a matter should be referred to Affirmative Action. After conferring with Major Langner and Deputy Warden Arasimowicz, Warden Gillis was of the opinion that since there were no particular suspects, there was noting to refer.
Warden Gillis heard nothing more about the plaintiff's claims until April 19, 1992 when he received Major Pizighelli's memorandum concerning her second complaint. On May 4, 1992, he wrote to the plaintiff detailing what had been done. A memo dated April 2, 1992 regarding sexual harassment was distributed to all staff members. On April 23, 1992, a memo regarding rumors and gossip was issued to be read at roll call for seven days. The letter said that inmates who directed comments to the plaintiff have been punished but Douglas Franklin was the only inmate who was disciplined. With respect to correction officers who may have been involved as rumor-mongers, the letter mentioned difficulty in identification despite having met with correction officers who the plaintiff mentioned as having knowledge of me rumors and others. The plaintiff was encouraged to report any future incident or bring any further information to the administration. Warden Gillis, however, made no effort to interview corrections officers who worked in Trimmer's block or those who were in the plaintiff's class at the academy. CT Page 9233
When the report and recommendation of the Affirmative Action Division was received, Warden Gillis interpreted it as the close of the investigation. As with the "inhouse" inquiries, Affirmative Action had not been able to determine the particular correction officers who were involved. Parenthetically, the testimony in court of current and former correction officers was no better.
Warden Gillis authorized the plaintiff's medical leave in August, 1992. But, he, in addition to Dianne Pierpont, did not know that in the same month the plaintiff applied to the new deputy, E. Horn, for placement on the transfer list to Camp Hartell.
In addition to offers of the possibility of a transfer made by Michelle Garvey and Ana Scott, Warden Gillis in August, 1992, also discussed a transfer with the plaintiff as a solution to the problem of unidentified rumor-mongers. In their discussion, the plaintiff worried about transfers of male corrections officers and male inmates to her new work site with a consequent repetition and spreading of the rumors. Later, of course, the plaintiff was offered a hardship transfer to the all-women's facility at Niantic as testified to by Dianne Pierpont.
In his testimony, Warden Gillis implied that perhaps the plaintiff could have avoided inmates repeating what certain correctional officers may have said, if she had made more use of incident reports.
 II.
Both parties acknowledge that on numerous occasions our Supreme Court has commented that although we are not bound by federal Title VII decisions, we are properly guided by federal fair employment opinions in the interpretation of our own antidiscrimination law. Bridgeport Hospital v. Commission onHuman Rights Opportunities, 232 Conn. 91, 108 (1995), State v.Commission on Human Rights Opportunities, 211 Conn. 464, 470
(1989); Civil Service Commission v. Commission on Human Rights Opportunities, 195 Conn. 226, 230 (1985). In the plaintiff's reply brief, however, the suggestion is made that the definition of sexual harassment in § 46a-60(a)(8)(C) permits a judgment in her favor if the court finds proven either that the conduct of the defendant and the correction officers had the purpose or CT Page 9234 effect of substantially interfering with her work performance or [of] creating an intimidating, hostile or offensive working environment. Facially, at least, the plaintiff's suggestion differs from the wording of the comparable federal law in MeritorSavings Bank FSB v. Vinson, 477 U.S. 57, 67, 106 S.Ct. 2399,91 L.Ed.2d 49 (1986), where the Supreme Court quoting Henson v. Cityof Dundee, 682 F.2d 897, 904 (11th cir. 1982) stated that "[f]or sexual harassment to be actionable, it must be sufficiently severe or persuasive 'to alter the conditions of [the victim's] employment and create an abusive working environment.'" (emphasis supplied.)
Although "or" and "and" generally connote either a disjunctive or conjunctive relationship, see D'Occhio v.Connecticut Real Estate Commission, 189 Conn. 162, 170 (1983), the court believes that any difference in the meaning of the federal and state statutes is more illusory than real. Especially is this so, given the almost identical language appearing in § 46-60(a)(8)(1) and 29 C.F.R. § 1604.11(a), the pertiment federal regulation as well as the term "hendiadys"[1] used inBennett v. New York City Department of Corrections, 705 F. Sup. 979,987 (S.D.N.Y. 1989) to describe what was meant by the "and" in Meritor Savings Bank, supra, and Henson, supra, and our Supreme Court's explanation that the intent of the legislature in enacting Public Act No. 426 (1967) to prohibit discrimination predicated on sex was to make our statute co-extensive with the federal one. State v. Commission on Human Rights Opportunities,supra, 211 Conn. 470.
 III.
Section 46a-60(a)(8) prohibits an employer or his agent from harassing any employee on the basis of sex. Sexual harassment is defined as "any unwelcome sexual advances or requests for sexual favors or any conduct of a sexual nature when (1) submission to such conduct is made either explicitly or implicitly a term or condition of the individual's employment, (2) submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individuals or (3) such conduct has the purpose or effect of substantially interfering with an individual's work performance or creating an intimidating, hostile or offensive working environment" Subsections (1) and (2) refer to a type of sexual harassment known as "quid pro quo"[2] while subsection (3) is concerned with a variety referred to as a "hostile [or abusive] work environment." see Karibian v. Columbia University, 14 F.3d 773, CT Page 9235 777 (2d cir.) cert. denied ___ U.S. ___, 114 S.Ct. 2693,129 L.Ed.2d 824 (1994). Although the parties agree that, in this case, only "hostile work environment" is involved, a brief review of both types of sexual harassment is helpful in illustrating the different presumptions and proofs that each of them requires.
In a "quid pro quo" case the relevant inquiry is whether the employer or his agent has linked tangible job benefits to the acceptance or rejection of sexual advances. Id. at 778. More important for the present inquiry is the status of the offending employees. If the offender has supervisory authority over the victim, the employer becomes strictly liable without any further showing of why the employer should be responsible for the supervisor's conduct. Kotcher v. Rosa And Sullivan ApplianceCenter, Inc., 957 F.2d 59, 62 (2d Cir. 1992); Henson v. City ofDundee, supra, 682 F.2d 910.
There is no conclusive presumption of strict liability for an employer in a hostile work environment situation. Instead, the Supreme Court said that Congress wanted courts to be guided by common law agency principles in this area. Meritor Savings BankFSB v. Vinson, supra, 477 U.S. 72. Moreover, the Supreme Court further noted that the definition of "employer" in 42 U.S.C. § 2000e(b), the federal counterpart of § 46a-60(a)(8), to include any "agent" of an employer manifested an intent to place some limits on the acts of employees for which employers under Title VII are to be held responsible. Ibid.
After the decision in Meritor Savings Bank and more so when its principles were reaffirmed in Harris v. Forklift Systems,Inc. 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993), courts began to judge hostile work environment claims by an elemental analysis. Although the elements required to be proven for a relief have been stated in terms of two to five, cf. Murrayv. New York University College of Dentistry, 57 F.3d 243, 249 (2d Cir. 1995) with Hirras v. National Railroad PassengerCorporation, 95 F.3d 396, 399 (5th Cir. 1996), the court's preference is for the five-point criteria set out in Hirras andMagnuson v. Peak Technical Services, Inc., 808 F. Sup. 50. 512 (1992), as the most inclusive method of exposition. To prove a work environment sexual harassment claim, a claimant must establish that: (1) she belongs to a protected class; (2) she was subjected to unwelcome sexual harassment; (3) the harassment was based on sex; (4) the harassment affected a term, condition or CT Page 9236 privilege of employment (i.e., that the harassment was sufficiently pervasive or severe to create an abusive work environment); and (5) the employer knew or should have known of the harassment and failed to take prompt remedial action. Hirras, supra, citing Jones v. Flagship International, 793 F.2d 714, 719-20
(5th Cir. 1986), cert. denied, 479 U.S. 1065, 107 S.Ct. 952,93 L.Ed.2d 1001 (1987); Magnuson, supra, citing Swentek v. U.S.Air, Inc., 830 F.2d 552, 447 and Henson v. City of Dundee, supra,
682 F.2d 903-04.
As a woman the plaintiff is clearly a member of a protected class, Magnuson, supra. At the trial, she proved that the comments from inmates that she was "the bitch with the balls," "the C.O. with the dick," a former man who had a sex change operation, or a half-man, were unwelcome comments of a sexual nature originating with correction officers and constituted sexual harassment. Accordingly, the first three elements can be considered proven. But these are the easy ones. In fact, the courts that restrict their analysis to two or three elements concentrate only on (4) and (5), e.g., Fuller v. City of Oakland,47 F.3d 1522, 1527 (9th Cir. 1995); Perry v. Ethan Allen. Inc.,
Slip Op. 3595, 3605 (2d Cir. 7/2/97).
To satisfy the fourth element or requirement, the sexual harassment must be sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment. Mere utterances of sexual epithets which perhaps give rise to offensive feelings on the part of an employee are not sufficient. Meritor Savings Bank, FSB v. Vinson,supra, 477 U.S. 67. As refined in Harris v. Forklift Systems,Inc., supra, the standard of pervasiveness or severity has both objective and subjective implications. The conduct at issue must create an objectively hostile or abusive work environment, one that a reasonable person, in the plaintiff's situation, would find to be hostile or abusive. Similarly, if a victim does not subjectively view the environment to be abusive, the conduct cannot be found to have altered the conditions of the victim's employment.114 U.S. 370.
This case differs from the usual reportings of prison-setting harassment, e.g., Snell v. Suffolk County, 611 F. Sup. 521 (D.C. N.Y. 1985), aff'd 782 F.2d 1094 (2d Cir. 1986); Bennett v. NewYork City Department of Corrections, supra, 705 F. Sup. 979, in that here the overt speakers of the degrading words and rumors were not sheriffs or correction officers but were prisoners who CT Page 9237 in no way can be considered as agents of the State or its Department of Correction. See Murray v. New York UniversityCollege of Dentistry, supra, 57 F.3d 250 (harassing patient not considered as agent of college dental clinic). But as the Affirmative Action investigation revealed, the originator of the rumor that the plaintiff had been a man and had undergone a sex change operation was one or more unidentified correction officers. And although the persons who were interviewed by Michelle Garvey and Ana Scott and the witnesses who testified in court could not or would not specify any culprits by name, they did identify them as correction officers. The identity of the originator of the rumor or of subsequent rumormongers, in the court's opinion, is not an essential aspect of the pervasiveness or severity of the sexual harassment. Rather, the questions are did the rumors exist and were they so pervasive that they affected the plaintiff's ability to perform her job as she testified.
On the issue of pervasiveness, the entire picture has been considered as Meritor Savings Bank, supra, 477 U.S. 64, andHarris, supra, 510 U.S. 23 command. Considering that the evidence disclosed periods of subsidence, the court cannot say that the plaintiff's workplace was permeated with sexual harassment but will say that the sexual harassment, disclosed to have been instigated and furthered by one or more correction officers, was sufficiently pervasive to be actionable[3] by the plaintiff as well as the theoretical "reasonable woman" in the plaintiff's situation.
The fifth element is where proof of the agency relationship discussed in Meritor Savings Bank, supra, 477 U.S. 72 is needed. The plaintiff must show that a specific basis exists for imputing the conduct that created the hostile work environment to the employer. Perry v. Ethan Allen, Inc., supra, Slip. Op. 3595, 3596. From the earlier description, it is apparent that the fifth element has two parts, the employer's actual or constructive knowledge of the harassment and the employer's inaction or lack of adequate action after learning of it. Hirras v. NationalRailroad Passenger Corporation, supra, 95 F.3d 399. A somewhat more refined statement of essentially the same criterion is that the plaintiff must prove that the defendant either provided no reasonable avenue for complaint or that the defendant knew of the harassment but did little or nothing about it. Kotcher v. Rosaand Sullivan Appliance Center, Inc., supra, 957 F.2d 63. CT Page 9238
On the issue of whether there was a procedure by which the complaint could be made, the plaintiff makes too much of the fact that in 1991 when she reported her conversation with inmate Trimmer, the; Department of Correction had no formal written directive on sexual harassment. Standing alone, the absence of a written sexual harassment policy does not mean that the employer has failed to supply a reasonable avenue for a complaint to be made. Nor does the absence mean that employer knew of the harassing conduct and did nothing to counter it. Reed v. A.W.Lawrence Co., Inc., 95 F.3d 1170, 1180 (2d Cir. 1996). Also most cases distinguish between sexual harassment from a supervisor and sexual harassment from a co-worker. The notice requirement may be discarded if a supervisory employee has used his authority to initiate or further the harassment or accomplishes the harassment through the existence of an agency relationship. Kariban v. Columbia University, supra, 14 F.3d 780. In this respect a similarity exists between hostile work environment and quid pro quo claims. Where as here, however, the harassment came from one or more co-workers, notice to or knowledge of the employer is required. Kotcher v. Rosa andSullivan Appliance Center, Inc., supra, 957 F.2d 63; Ansfeldtv. Dixon, 950 F. Sup. 478, 482-83 (N.D.N.Y. 1997). In this case, the plaintiff had no difficulty bringing her claims of sexual harassment to the attention of her superiors. The real concern is with the efficacy of the defendant's responses. When, after speaking with inmate Trimmer, the plaintiff filed her report, dated August 13, 1991, with Lieutenant Moore, she, shortly thereafter, was seen by Major Langner and Deputy Warden Arasimowicz. By the end of the month, Arasimowicz had issued a reminder to all staff that harassing statements and actions against other staff were not permitted. After Arasimowicz' reminder, the rumors appeared to have quieted down until March 1992 when the plaintiff testified that she spoke to Vernetha Gibson.
Following the conversation with Gibson, the plaintiff conferred with Major Pizighelli on April 1, 1992. He responded by issuing, on the next day, the notice regarding sexual harassment and its prohibition that was read at roll call for seven days. After the plaintiff gave Major Pizighelli names of specific correction officers on April 28, 1992, he was prompt in his interviews of them.
There were weaknesses in the defendant's responses to the harassment. It was the plaintiff, not a member of the administration, who made the telephone call to CT Page 9239 Affirmative Action on April 30, 1992. Administrative Directive 2.2 places the onus to advise Affirmative Action of a sexual harassment complaint on the administrator of the unit, in this case, Warden Gillis. Another weakness was that Affirmative Action did not start the interviews until August 6, 1992. But whereas these weaknesses must be counted as such in the total scheme of things, it is doubtful whether more prompt action would have yielded better results. As mentioned earlier, all correction officers interviewed denied their own active involvement and could not or would not recall specifically others who had spread rumors or made comments.
Then, there is the relief proffered to the plaintiff. Not only were transfers recommended on a first available basis, a hardship transfer was arranged and offered for the all-women's facility at Niantic as the best way to separate the plaintiff from the rumors. The plaintiff's rejections of Niantic and the proposed transfers to other jails or prisons were based on reasons that the court regards as untenable assuming that the plaintiff wanted to continue as a correction officer. Her alternative proposal of remaining at NHCC but somehow out of the sight of the inmates would only perpetuate the problem considering the incidents of graffiti and the scratched in hermaphroditic figure.
Nor can the courts agree with the contention that when the plaintiff returned from medical leave, Warden Gillis' statement that she would participate in the rotational shifts with all other employees was tantamount to a constructive discharge. Subsequently, when the plaintiff was still employed and on her second medical leave, the transfer to Niantic became a reality and other transfers were recommended. A constructive discharge occurs when an employer deliberately makes working conditions so difficult or unpleasant that a reasonable person in the employees situation would feel compelled to resign. Martin v. Citibank N.A., 762 F.2d 212, 221 (2d Cir. 1985). The idea of a constructive discharge in the instant case is negated by the defendant's offers of transfers.
Whether the plaintiff has proved a valid claim of discrimination depends upon all of the circumstances. Harris v.Forklift Systems, Inc., supra, 510 U.S. 23. From the total picture, as disclosed by the findings and legal references, the court concludes that the plaintiff has not proven the required fifth element of her hostile work environment claim. Consequently, judgment is rendered for the defendant. CT Page 9240
Barnett, J.