**Joseph PROCTOR**

v.

**MCI COMMUNICATIONS CORPORATION.**

**No. 3:96CV1406 (AHN).**

United States District Court, D. Connecticut.

July 30, 1998.

John Rose, Levy & Droney, John Pavia, Levy & Droney, Hartford, CT, for plaintiff.

Kerry Callahan, Updike, Kelly & Spellacy, Hartford, CT, for defendant.

## MEMORANDUM OF DECISION

NEVAS, District Judge.

The plaintiff, Joseph Proctor ("Proctor"), brings this suit against the defendant, MCI Communications Corporation ("MCI"), for employment discrimination in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e—2000e–17 ("Counts One and Two") and the Connecticut Fair Employment Practices Act ("CFEPA"), Conn. Gen.Stat. §§ 46a–51—104 ("Count Four"); and for breach of implied contract ("Count Three"), breach of covenant of good faith and fair dealing ("Count Five"), intentional infliction of emotional distress ("Count Six"), and negligent infliction of emotional distress ("Count Seven").

Proctor alleges that, from 1989–1995, he was denied promotions and eventually terminated because of his race (African American). MCI, on the other hand, claims that Proctor was terminated for sexually harassing two co-workers and that, to the extent that he was denied promotions, such denials were based on legitimate, non-discriminatory reasons.

On February 23, 1998, the court granted MCI's Motion for Summary Judgment as to the common law claims alleged in Counts Three, Five, Six and Seven and denied it as to the Title VII and CFEPA claims contained in Counts One, Two and Four. From July 13, 1998 to July 22, 1998, these remaining counts were tried to the court. For the reasons set forth below, the court finds in favor of MCI with respect to Proctor's race discrimination claims.

## STANDARD OF REVIEW

■ "The ultimate issue in an employment discrimination case is whether the plaintiff has met [his] burden of proving that the adverse employment decision was motivated at least in part by an impermissible reason, i.e., a discriminatory reason." *Stratton v. Dep't for the Aging for the City of N.Y.*, 132 F.3d 869, 878 (2d Cir.1997). The plaintiff can meet this burden by either proving a "mixed motives" case under *Price Waterhouse v. Hopkins*, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989), and its progeny, or by proving a pretext case under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and its progeny. Because the court is not certain which claim Proctor is asserting, it will give him the benefit of the doubt and analyze his claims under both standards.[1]

### I. *McDonnell Douglas Standard*

■ To sustain a claim of discrimination based on race or color pursuant to Title VII, a plaintiff must satisfy a three-part burden-shifting test. *See McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817; *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993); *Texas Dep't Community Affairs v. Burdine*, 450 U.S. 248, 252–53, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). First, the plaintiff has the initial burden of establishing a *prima facie* case of discrimination. *See McDonnell Douglas*, 411 U.S. at 801, 93 S.Ct. 1817. If the plaintiff meets this burden, the burden shifts to the defendant "to articulate some legitimate, non-discriminatory reason" for the challenged employment action. *See id.; Hicks*, 509 U.S. at 507, 113 S.Ct. 2742. Finally, should the defendant meet this burden of production, the plaintiff must then prove by a preponderance of the evidence that the legitimate reason offered by the employer is merely a pretext for discrimination. *See McDonnell Douglas*, 411 U.S. at 804, 93 S.Ct.

1817; *Burdine*, 450 U.S. at 252–53, 101 S.Ct. 1089.

■ To establish a *prima facie* case under Title VII, a plaintiff must demonstrate that: 1) he belongs to a protected class; 2) he was qualified for the position; 3) despite these qualifications, he suffered an adverse employment decision; and 4) the decision occurred under circumstances giving rise to an inference of discrimination based on his membership in the protected class. *See Ramseur v. Chase Manhattan Bank*, 865 F.2d 460, 464 (2d Cir.1989); *Newman v. Montefiore Medical Center*, Nos. 95 CIV. 5614(RWS), 96 CIV. 2687(RWS), 1996 WL 741599, at *4 (S.D.N.Y. Dec. 27, 1996).

■ "Once the plaintiff has presented a *prima facie* case of discrimination, the defendant has the burden of producing, through the introduction of admissible evidence, reasons for its actions which, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action." *Chambers*, 43 F.3d at 38 (citation and internal quotation marks omitted). "Any legitimate, non-discriminatory reason will rebut the presumption triggered by the prima facie case." *Fisher v. Vassar College*, 114 F.3d 1332, 1335–36 (2d Cir.1997) (en banc).

■ If the employer satisfies its burden of production, the plaintiff must "demonstrate ... that the [employer's] proffered reason was not the true reason for the employment decision, but was in fact a pretext for discrimination." *Sutera v. Schering Corp.*, 73 F.3d 13, 17 (2d Cir.1995) (citation and internal quotation marks omitted). Stated another way, the plaintiff must prove by a preponderance of the evidence that the employer's proffered reason is false and that discrimination is the real reason for the termination. *See Quaratino v. Tiffany & Co.*, 71 F.3d 58, 64 (2d Cir.1995). Of course, a finding of pretext may simply hide an improper motive

---

1. Connecticut courts look to federal discrimination law for guidance in determining liability under CFEPA. *See State v. Commission on Human Rights & Opportunities*, 211 Conn. 464, 470, 559 A.2d 1120 (1989); *Levy v. Commission on Human Rights and Opportunities*, 35 Conn.App. 474, 480, 646 A.2d 893 (1994). Specifically, they

apply the standards set forth by the Supreme Court in *McDonnell Douglas* and *Price Waterhouse*. *See Levy*, 35 Conn.App. at 480, 646 A.2d 893. Thus, this court will apply the same standard of review to Proctor's Title VII and CFEPA claims.

that is *not* illegal, such as "institutional politics, envy, nepotism or spite." *Stratton*, 132 F.3d at 880.

The court has already found, in response to MCI's Motion for Summary Judgment, that Proctor has established a *prima facie* case of employment discrimination in connection with his termination and failure to receive promotions and that MCI has come forward with legitimate, non-discriminatory reasons for these employment actions. Thus, for the purposes of this ruling, the court need only consider whether MCI's proffered reasons are merely a pretext for race discrimination.

## II. *Price Waterhouse Standard*

 A "mixed motives" case is one in which the employer has both a legitimate and a discriminatory motive for terminating the employee. *See Price Waterhouse*, 490 U.S. at 258, 109 S.Ct. 1775. In such a case, "a plaintiff must initially proffer evidence that an impermissible criterion was in fact a motivating or substantial factor in the employment decision." *de la Cruz v. New York City Human Res. Admin. Dep't of Soc. Serv.*, 82 F.3d 16, 23 (2d Cir.1996) (citation and internal quotation marks omitted). This is a greater burden than the burden the plaintiff bears in establishing his *prima facie* case under the *McDonnell Douglas* framework. *Id.* "Only after it is shown that the forbidden animus was a motivating factor in the employment decision does the burden shift to the employer to prove that it would have made the same decision absent the discriminatory factor." *Raskin v. The Wyatt Co.*, 125 F.3d 55, 60 (2d Cir.1997) (citation and internal quotation marks omitted).

## DISCUSSION

### I. *Termination*

 Based on the testimony of the witnesses and the documentary evidence presented at trial, the court makes the following findings of fact with respect to Proctor's termination.

In or about 1989, Erin Flynn ("Flynn"), an administrative assistant in MCI's Wethersfield office, reported to Ronald Zajac ("Zajac"), the branch manager of that office, that Proctor had asked her out occasionally and made her feel uncomfortable, telling her that he and his wife had an "open relationship." In response, Zajac counseled Proctor and advised that he cease such conduct. He did not document this in writing.

In or about 1991, Karen Fairchild ("Fairchild"), an administrative assistant in the Wethersfield office, complained to Proctor's supervisor, Duane Cashin, who then reported to Zajac, that Proctor was making her feel uncomfortable by spending a lot of time at her cubicle, leaving numerous messages on her voice mail at work and calling her more than once at home. She testified that, in his conversations with her, he often made reference to sexual topics and complimented her on parts of her anatomy. He also told her that he and his wife had an "open relationship" which allowed him to engage in extramarital affairs. In response, Zajac counseled Proctor to refrain from such behavior and warned him that this was the second complaint against him involving similar allegations. He did not document this in writing.

In early 1992, Mark Facey ("Facey"), the president of Mark Facey & Company, a then potential customer of MCI, reported to James Stupak ("Stupak"), who managed a region for MCI which included the Wethersfield office, that two of his employees had complained about inappropriate sexual advances by Proctor. In response, Stupak verbally warned Proctor, telling him to refrain from such conduct and advising him that further complaints of sexual harassment would result in disciplinary action. Stupak did not document this warning in writing.

In early February, 1995, Lisa Delap ("Delap"), a Telecommunications Sales Representative in the Wethersfield office, complained to her supervisor, William Mooney ("Mooney"), that Proctor had been bothering her and making her feel uncomfortable. Specifically, she advised Mooney that Proctor had told her that Mooney had asked him to help Delap with her sales because she was failing as a TSR and was in danger of being fired. In fact, Mooney had not said this to Proctor.

Shortly thereafter, Delap reported Proctor's conduct to Zajac. She told him that (1) while they were at Proctor's home, prior to going out on a sales call together, Proctor told her that his wife traveled often, giving him time for casual sexual relationships and then hugged her for an uncomfortably long period of time and told her that she could pay him back for helping her to improve her sales; (2) Proctor repeatedly asked her out on dates and called her at work and at home, telling her, on more than one occasion, that she still had to pay him back for his help; and (3) after being told by Delap to leave her alone and stop calling her, Proctor called her again and told her that Mooney had asked him to take her out on another sales call because she was in danger of losing her job.

Prior to reporting his conduct to Mooney and Zajac, Delap confronted Proctor and told him to leave her alone. In response, he asked her if she was going to bring her complaint to management and advised her that, if she did, it would be his word against hers.

At or around the same time, Theresa Jones ("Jones") went to Zajac and complained that Proctor (1) was repeatedly asking her out on dates; (2) had told her that he and his wife had an "open" marriage; (3) had tried to kiss her in the parking lot of a Hartford jazz club; and (4) had asked that she not report his behavior to management.

On or about February 7, 1995, Zajac called both Stupak, the regional manager, and Linda Shinomoto ("Shinomoto"), from MCI's Human Resources Department in Boston, Massachusetts, to initiate an investigation of Jones's and Delap's complaints against Proctor. On February 9, 1995, Shinomoto came from Boston to the Wethersfield office to investigate the complaints and make a recommendation as to the appropriate course of action. First, she met with Zajac and Stupak, who both informed her of Proctor's prior incidents of sexual harassment. Using this information as background for the investigation, she then interviewed Delap, Jones and Proctor. She took careful notes of her interviews with Delap and Jones, who gave substantially the same accounts that they had initially reported to Zajac.

Shinomoto asked Zajac to sit in on her interview with Proctor. After Zajac confronted Proctor with the allegations, Proctor denied them and asserted that other employees in the office could corroborate his claim that Delap and Jones themselves engaged in inappropriate behavior in the office. Unlike the other interviews, Shinomoto took no notes in her interview with Proctor, testifying that she wanted to focus on his mannerisms and expressions to better enable her to determine whether he was telling the truth.

At the end of the interview, after he had persisted in denying any inappropriate behavior towards Delap and Jones, Proctor asked Zajac and Shinomoto if he could tell them something that he would like them to keep confidential. Shinomoto, however, warned him that she could not promise that his disclosures would remain confidential. Nonetheless, Proctor then disclosed what he described as the "real" story, which, according to him, was that he and Jones had been having an affair and that Jones and her close friend, Delap, had made complaints against Proctor because he had broken off this affair. According to him, Jones complained because she was a "scorned woman."

Shinomoto and Zajac then left the room for a short period of time and conferred with Stupak. At that time, Shinomoto strongly recommended termination, and Zajac agreed. With Stupak's approval, they re-entered the room, and Zajac terminated Proctor.

With respect to MCI's discipline of employees found to have engaged in sexual harassment or other misconduct, the company does not have a mandatory progressive discipline policy, i.e., MCI does not have mandatory steps of discipline which every manager and Human Resource person must employ. (*See* Pl.'s Ex. 8 § C–2.110A at 1.) Instead, managers have discretion as to what form of discipline they will use. MCI does, however, train its managers and Human Resource employees to follow the steps of progressive discipline detailed in the MCI manual whenever, in their discretion, such steps are warranted. Said another way, managers are trained that, while they have total discretion in determining appropriate discipline,

when they decide to employ progressive steps of discipline, they should strictly adhere to the steps described in the manual, properly administer them and carefully document their actions. For example, if a manager decides to give a verbal warning, he or she should adhere to the procedural requirements of this disciplinary action, as they are trained to do by MCI's Office of General Counsel.

Based on these findings of fact, the court concludes that Proctor was not terminated because of his race. Rather, sexual harassment was the "real reason" for his termination. Further, the court cannot find that the plaintiff has proven by a preponderance of the evidence that race was a motivating factor in his termination. There is insufficient evidence to show that, even if Proctor was terminated in part because of sexual harassment, he was also terminated or treated differently in the disciplinary process because of his race.

In reaching this conclusion, the court credits the testimony of Shinomoto, Zajac, Stupak and Delap. First, the court finds Delap's testimony credible and believes that Proctor did in fact engage in the conduct of which he was accused. Second, the court finds that Zajac and Stupak were truthful when they testified that they had warned Proctor on three prior occasions about his conduct toward women in the office. Third, and most importantly, the court finds Shinomoto to have been a very credible witness and that her strong recommendation that Proctor be terminated was based on her interviews with Jones and Delap, her belief that they were telling the truth and her belief that Proctor had engaged in what she considered to be seriously egregious behavior towards these two women. She testified that she was most concerned with their claims that Proctor had tried to use his position in MCI to get them to go out on sales calls with him and to get them to "pay him back" for his help.

While the court would like to believe that every witness who testifies in a trial testifies truthfully, the court recognizes that this does not always happen and certainly did not happen in this case. Some witnesses were untruthful in their testimony. For example, while the court believes the portion of Fairchild's testimony relating to her allegations of harassment against Proctor, it does not believe her claim that Proctor never met her mother at the Wethersfield office and that he never went to her house to help her move. Also, while the court believes a substantial portion of Stupak's testimony, it does not believe that he ever memorialized in writing his verbal warning to Proctor regarding the Facey incident, despite his claim that he did so.

Nonetheless, for the court to believe most or all of Proctor's testimony, the weight of which is crucial to his case, it would have to conclude that many of MCI's witnesses lied during their testimony. For example, Proctor claims that he never harassed Flynn, Fairchild, the two Facey employees, Jones, or Delap. Thus, for the court to conclude that Proctor was telling the truth, it would have to conclude that Flynn, Fairchild, Delap, Zajac and Stupak testified untruthfully about these incidents. Proctor further claims that Zajac never warned him about the Flynn and Fairchild incidents and that, while Stupak told him that Facey had a problem with him, he neither explained that the problem related to allegations of harassment by Facey employees, nor warned him that such conduct would, in the future, result in serious disciplinary consequences. Thus, both Zajac and Stupak would have had to have lied when they testified that they did speak to Proctor about these three prior incidents and did warn him that such behavior must cease or result in serious disciplinary consequences.

Lastly, and most importantly, Proctor denied that he told Shinomoto and Zajac that he had been having an affair with Jones and that she accused him of sexual harassment because he had broken off the affair with her. For the court to believe Proctor, it would have to conclude that both Shinomoto and Zajac lied when they testified that, towards the end of their interview with Proctor, he disclosed his "real" explanation for the sexual harassment complaints, explaining that he and Jones had been involved in an intimate, sexual relationship. Even if the court questioned Zajac's veracity, which it does not, it does not question Shinomoto's.

She was completely forthright and credible in her testimony. The court does not believe that she lied when she testified that Proctor told her that he and Jones had been having an affair.

Proctor concedes that Shinomoto was not motivated by race when she recommended his termination. Rather, he claims that Zajac and Stupak were motivated by race when they initially spoke with Shinomoto and reported Delap's and Jones's complaints. According to Proctor, they tainted the entire investigation by lying about prior complaints of sexual harassment against Proctor and by withholding valuable information both about the credibility of Delap and Jones and about other witnesses who could corroborate Proctor's side of the story.

The court is not persuaded. First, as stated previously, the court believes that Proctor did, in fact, harass Flynn, Fairchild and two Facey employees and that Zajac and Stupak warned him about his behavior. Thus, their mention of this to Shinomoto was entirely appropriate.

Second, there is insufficient proof in the record to conclude that Zajac and Stupak were motivated by racial animus. Again, crediting Zajac and Stupak's testimony on this point, and discrediting Proctor's testimony, the court can, at most, find that Zajac made one arguably racially motivated remark when, on two separate occasions, he referred to Proctor and other African American employees at MCI as the "Rainbow Coalition." [2] This remark was inappropriate. Proctor told Zajac that he found it offensive, and Zajac never said it again. However, this remark, alone, is insufficient to show, by a preponderance of the evidence, that Zajac was racially motivated when he initiated the investigation which resulted in Proctor's termination.

Zajac hired Proctor. On at least one occasion, in response to Proctor's complaint about a low performance review, he changed the review from a "Some Improvement Required" rating to a "Fully Met" rating. When confronted with harassment allegations against Proctor by Flynn, a woman whom some of Proctor's witnesses described as Zajac's favorite in the office, Zajac did not place a written warning in Proctor's personnel file. In fact, according to Zajac, he did not want to make a permanent record of the incident because he felt that it was not serious, and he was concerned about Proctor's future. Then, when confronted a second time with allegations of harassment by Fairchild, Zajac again opted to merely counsel Proctor and not make a written record of the incident, worried that Proctor's career could be jeopardized if the complaint was documented in his file. If Zajac wished to discriminate against Proctor because of his race, he had numerous opportunities to do so in the past. If anything, he afforded Proctor special treatment that was arguably too lenient.

With respect to Stupak, there is simply no reliable evidence in the record to suggest any racial animus on his part. He made no inappropriate remarks to or about Proctor or any other African American employees in the office, and there is no other direct or circumstantial evidence in the record which shows that his actions were motivated at all by race.

Lastly, the court does not believe that Shinomoto would have acted differently had she interviewed other witnesses or been told about inappropriate behavior allegedly engaged in by Delap and/or Jones in the office. Shinomoto testified that she recommended termination based on her belief that Jones and Delap were telling the truth about Proctor's harassment of them and her conclusion that such conduct was reprehensible. This court had the opportunity to watch Delap testify. She was a very credible witness. Her allegations against Proctor are both compelling and disturbing. No other witness besides Delap, Jones and Proctor could have testified as to what occurred between them. Thus, regardless of whether Shinomoto knew about other MCI employees who would have supposedly told her that Proctor was amiable and decent and that Delap and Jones were flirtatious and untrustworthy, she still would have recommended termination based on her

2. On one of those occasions, there were some white employees standing in the group with Proctor.

strong belief that Delap and Jones were telling her the truth about Proctor's conduct.

Despite the court's ruling that race was not a motivating factor in Proctor's termination, it bears mention that Shinomoto, Zajac and Stupak, in dealing with the complaints of sexual harassment against Proctor, did not follow proper MCI procedures. As Barrie Novak, Donna Key, Stephen Schipani and Allison Leonard–Leach testified, all MCI managers and Human Resource personnel are trained by MCI's Office of General Counsel to adhere to the disciplinary procedures set out in MCI's manual. First and foremost, they are trained to document everything. Second, as Novak and Key testified, a Human Resource employee investigating a sexual harassment complaint should attempt to find out as much relevant information as possible prior to concluding an investigation. While she should meet with the appropriate managers, she should independently investigate all allegations of inappropriate conduct and err on the side of interviewing all witnesses who may have information which could aid her in making her final recommendation. Lastly, although managers need not employ mandatory progressive steps of discipline, if they choose to implement any of the progressive steps, they should strictly adhere to the procedures that are outlined in their training sessions.

Zajac should have verbally warned Proctor for his harassment of Fairchild, *documenting* this warning in his file. At a minimum, Stupak should have documented his verbal warning to Proctor regarding Facey's allegations. Shinomoto should have interviewed every employee who could have provided information relevant to her investigation. In light of the fact that Proctor's prior acts of sexual harassment were not documented, Shinomoto should have investigated the incidents and at least interviewed Flynn, Fairchild and Facey. She also should have taken careful notes during her interview with Proctor, consistent with her practice during her interviews with Delap and Jones.

Nonetheless, these procedural defects are not sufficient to support Proctor's employment discrimination claims. While Zajac, Stupak and Shinomoto did not fully comply with MCI's procedures, the court cannot find that the defects in both Zajac's and Stupak's documentation of the prior complaints of sexual harassment against Proctor and Shinomoto's investigation of Delap's and Jones's complaints were the result of, or were motivated, even in part, by racial animus.

One further point should be made. Even if the court ruled in Proctor's favor, the damage award would be modest. As will be discussed further below, the court finds that Proctor was not promoted to the position of National Accounts Executive, for which he applied in December, 1995, because of legitimate, non-discriminatory reasons. Thus, contrary to Proctor's claims, the court could not have based a damage award on the salary that he would have earned in that position. Rather, any award of economic damages would have to be based on the salary that he was earning when he was terminated. Thus, because Proctor found a higher paying job within a month of his termination, his only damages would have arisen from the alleged emotional harm that he suffered as a result of his termination. However, based on the evidence presented, the monetary damages for such harm would have been minimal.

## II. *Promotions*

Based on the testimony of the witnesses and the documentary evidence presented at trial, the court makes the following findings of fact with respect to Proctor's claim that he was denied promotions during his tenure at MCI because of his race.

On April 6, 1988, MCI hired Proctor as a telemarketing representative in Phoenix, Arizona. Then, on August 23, 1988, Proctor received a raise and was promoted to an Account Executive I. In March, 1989, Proctor transferred from MCI's offices in Arizona to its offices in Wethersfield, Connecticut, at his request, because his wife's employer had transferred her to Connecticut.

On April 6, 1991, Proctor was promoted to Senior Account Executive I. He received an eleven percent increase in his salary, over half of which was a merit increase because he had "fully met" his annual performance goals. Then, on April 8, 1992, Proctor re-

ceived an overall performance rating of "Consistently Exceeding," and, in connection with this review, was promoted to Account Executive II. He received another eleven percent raise, over half of which was a merit increase.

On May 3, 1993, despite the fact that he had not met one hundred percent of his performance goals, he received an overall performance rating of "Fully Met." However, his performance declined the next year, and on or about May 11, 1994, Proctor received an overall performance rating of "Some Improvement Required." His manager noted, "Joe has shown that he can perform at the levels required of a tenured AEII but he has been inconsistent to date."

Throughout his years at MCI's Wethersfield office, from 1989 until his termination, Proctor was an inconsistent performer. While Proctor received a March 10, 1990 performance rating of "Some Improvement Required" and remained on probation after he began in the Wethersfield office because he was not meeting his sales quota, his performance subsequently improved dramatically, and, in 1992, he made Chairman's Inner Circle, a designation reserved for employees of MCI nationwide whose sales figures are in the top five percent for the entire company. However, in May of 1994, he again received a "Some Improvement Required" performance review. According to Stupak, he was a "peak and valley" performer.

Throughout his tenure with MCI's Wethersfield office, Proctor only posted for promotions twice. An employee "posts" for a position when he applies for an internally advertised job opening.[3] In or about 1992, Proctor posted for a National Accounts Executive position. Marsha Garcio, a white, female MCI employee from the Stamford office, was promoted to this position. Then, in early December, 1994, after MCI had listed a posting for either a National Accounts Executive or Senior National Accounts Executive position, Proctor again posted for a National

Accounts Executive position. While he had initially decided not to post for this position, he changed his mind when a co-worker of Scott MacCloy ("MacCloy"), the hiring manager for the position, contacted Proctor on behalf of MacCloy and urged him to post for the position.

Proctor interviewed with both MacCloy and MacCloy's supervisor, Blair Crump. Based on his performance in these interviews and his employment record, MacCloy offered him the job, but advised him that he did not know his exact starting date because the hiring process was still uncertain.

On or about January 1, 1995, MCI's hiring needs changed. While the National Accounts Executive position had been created to handle the sales opportunities that were to arise from MCI's recently awarded contract from the State of Connecticut and thus did not require management experience, new business opportunities arose for MCI which altered its employment strategy. MCI learned both that it was about to be awarded the contract for the State of Massachusetts and that, under its agreement with the State of Connecticut, every Connecticut agency would be using MCI services so that MCI sales representatives would not have to try and sell these services to each individual state agency. For these reasons, MacCloy determined that he did not need a strong sales representative, but rather needed a person with strong management skills to manage the Massachusetts and Connecticut accounts. Thus, he decided not to fill the National Account Executive position and instead, in mid-February, 1995, after Proctor had already been terminated, listed a posting for a National Accounts Manager.[4]

Contrary to Proctor's claim, the job for which he interviewed, the National Accounts Executive position, was never filled. As to Mark Sadinsky ("Sadinsky"), the person who Proctor claims was interviewed and hired for the National Accounts Executive position, the

---

3. In the Wethersfield office, openings for positions within MCI are "posted" on a bulletin board. Employees who qualify for a posted opening may apply for that position. These postings remain open for a limited period of time before they are advertised externally.

4. The National Accounts Manager position is a level S45 position while the National Accounts Executive position is a level S41 position.

court believes MacCloy's testimony that Sadinsky was neither interviewed nor hired for this job. Rather, Sadinsky, a Sprint employee at the time, inquired about the National Accounts *Manager* position in February, 1995, but was never formally offered the job.[5]

In or about January, 1995, after Proctor had discovered that he would not be taking the National Accounts Executive position, he agreed, at Stupak's behest, to move into one of two new positions created to manage and oversee all of the sales accounts from MCI's existing client base. According to Stupak, these Current Account Manager 3 positions were vital to MCI's business because, at the time, MCI generated twenty to forty percent of its revenue from these accounts.

Based on these findings of fact, the court concludes that Proctor has failed to prove by a preponderance of the evidence that he was denied promotions during his tenure at MCI's Wethersfield office because of his race. To the extent that MCI denied promotions to Proctor, race was not a pretext for the employment decision, nor was it a motivating factor in the employment decision.

Putting aside for the moment the National Accounts Executive position for which he posted in December, 1994, the court finds that Proctor only posted for one other position at MCI, a National Accounts Executive position offered in 1992. Proctor presented no evidence to show that the woman who was given this position was less qualified than he. Proctor simply asserts that he had more experience and was better qualified for the position. This testimony alone, especially in light of the court's conclusion that Proctor was not a credible witness, is insufficient.

Furthermore, as the court has already held, Proctor has failed to show that Zajac's or Stupak's actions were motivated by racial animus. Thus, even if the court assumes that Proctor submitted competent evidence regarding his qualifications for the 1992 National Accounts Executive position, the court could not find that MCI's failure to promote

him to this position was motivated, even in part, by his race.

Proctor points to the testimony of Darrell Sullivan ("Sullivan") and Walter Woodgett ("Woodgett"), two other African American employees in MCI's Wethersfield office, to support his claim that the Wethersfield office engaged in a pattern and practice of race discrimination by denying promotions to qualified African American employees. However, this testimony alone is not enough. There is no evidence in the record to show that less-qualified, non-African American employees received promotions over equally or more qualified African–American employees. There is also no evidence to show that Sullivan and Woodgett were similarly situated to Proctor.

Woodgett worked at MCI from 1993 to 1994. He began as an Account Executive II and *never* posted for a higher position. Sullivan worked at MCI from 1988 to 1993. He also began as an Account Executive II and was never promoted to another position.

Proctor, on the other hand, worked at MCI for almost seven years. He began as a telemarketing representative, was promoted to an Account Executive I, then to a Senior Account Executive I, then to an Account Executive II, and finally to a Current Account Manager 3. He posted for promotions twice, once in 1992 for a National Accounts Executive position, and once in 1994, again for a National Accounts Executive position. While another employee was chosen for the 1992 opening, Proctor was chosen to fill the 1994 opening. Only after MCI decided that it would not fill this National Accounts Executive position and would instead fund a National Accounts Manager position, did it decide not to offer the National Accounts Executive position to Proctor. Thus, there is insufficient evidence to link MCI's treatment of Sullivan, Woodgett and Proctor and thereby show that its Wethersfield office engaged in a pattern or practice of race discrimination.

Based on the evidence in the record, Proctor did, in fact, receive performance related

---

**5.** In fact, Sadinsky admitted to MacCloy that he was only inquiring about the job to secure a

promotion with Sprint.

promotions during his tenure at MCI. In 1988, he was promoted from a telemarketing representative to an Account Executive I. In 1991, based on his prior year's performance rating of "Fully Met," he was promoted to Senior Accounts Executive I. In 1992, based on his prior year's performance rating of "Consistently Exceeding," he was promoted to Accounts Executive II. However, in May, 1994, he received a "Some Improvement Required" performance rating for the prior year, indicating, among other things, that he had not met the sales objectives set for that year. Then, in December, 1994, he posted for and was offered a position as National Accounts Executive with MCI's Glastonbury, Connecticut office. He did not take this position because MCI decided to withdraw its funding for it and instead fund a position for National Accounts Manager, a position which required managerial experience. Thus, Proctor has not proved by a preponderance of the evidence that he was denied promotions based on his race. In fact, the evidence in the record shows that Proctor's promotions at MCI were based on his performance. He was promoted when his performance met or exceeded sales objectives and was denied promotions when his performance did not meet such goals.

In addition to the above stated conclusions, the court specifically concludes that Proctor was not denied the December, 1994 National Accounts Executive because of his race. The court credits MacCloy's testimony and finds that the reasons that he gave for ultimately choosing not to hire Proctor were the *real reasons* for the employment decision and not simply a pretext for discrimination. The court further concludes that race was not a motivating factor in MacCloy's employment decision and that he did not fill the National Accounts Executive position for the reasons articulated by him on the stand and reviewed in the court's findings of fact.

### III. *Commissions*

Proctor's complaint also alleged that he was never fully compensated for his work on either the Timex or Mark Facey accounts. These claims, however, to the extent that they were even pressed by Proctor as part of his race discrimination case, cannot be supported by the record. First, there was insufficient evidence to support a finding that Proctor did not receive appropriate compensation for his work on these accounts. Second, even if the court assumes *arguendo* that Proctor did not receive the commissions or compensation due to him, the court could not conclude, based on the evidence presented, that such treatment was motivated, even in part, by his race.

### CONCLUSION

For the reasons stated above, the court finds that MCI has not engaged in race discrimination, in violation of Title VII or CFEPA. The Clerk of the Court is instructed to enter judgment in favor of MCI as to all counts of Proctor's Amended Complaint.